[Crim. No. 5516. First Dist., Div. One. June 30, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FELTON U.
THERIOT, Defendant and Appellant.

Molly H. Minudri, Enrico Dell'Osso and Claude O. Allen for Defendant and Appellant.

Thomas C. Lynch, Attorney General, John T. Murphy and Robert S. Shuken, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed, through separate notices of appeal filed individually and by his attorney, from a judgment sentencing him to life imprisonment following his conviction by the court of murder in the first degree. (Pen. Code, §§ 187, 190.)

The defendant, following his indictment for the murder of his wife, entered pleas of not guilty and not guilty by reason of insanity, and the matter was regularly set for trial before a jury. At the conclusion of the seventh day of the trial, the defendant requested and secured a week's continuance to study the admissibility of, and the possible effect on expert testimony of, a document written by the defendant some months before uxoricide. When the trial reconvened the defendant waived further trial by jury. His waiver was concurred in by the prosecution and accepted by the judge, who, after further trial, determined the case on the merits, fixed the degree, and, pursuant to stipulation entered into in open court, determined the issues of insanity and penalty; the former adversely, and the latter favorably, to the defendant.

On this appeal defendant's trial attorneys filed a brief in which it is contended (1) that the evidence shows as a matter of law that the defendant was in a mental state where he could not form the intent to commit first degree murder or deliberate and premeditate that crime; (2) that he was so intoxicated that he did not have the mental state which was required for malice aforethought or premeditation; and (3) that the trial court erred in failing to exclude statements taken from the defendant following his arrest because he was not properly advised of his constitutional rights. Following substitution of attorneys, a supplemental brief was filed on his behalf in which it is contended that the trial court erred in applying the law given to medical witnesses as to deliberation and premeditation, and in not accepting the doctrine of diminished capacity in setting the degree of guilt of the defendant. This court is requested to reduce the offense to voluntary manslaughter.

A review of these questions reveals that there was no error in the admission of evidence of defendant's statements; that the evidence is sufficient to sustain the trial court's implied finding that defendant's mental capacity was not significantly impaired by intoxication; that the evidence is sufficient to sustain the trial court's implied finding that defendant had sufficient mental capacity to entertain the requisite malice aforethought, intent, deliberation and premeditation for the offense of which he was convicted; and that the trial court was cognizant of, and applied, the proper legal criteria in questioning the medical witnesses and in determining the degree of guilt of the defendant.

*Statement of Facts*

On Sunday morning, January 24, 1965, Corning T. Mc-Kennee, a student at the University of California, Berkeley, was working on an experiment in the Life Sciences Building ("LSB")[1] on the Berkeley Campus. He had arrived shortly after 9 a.m., left to get some materials for his experiment, and returned to find that Gladys (Pat) Theriot had arrived in his absence. Mrs. Theriot was a laboratory technician, and on that morning was doing routine laboratory work.

McKennee and Mrs. Theriot exchanged greetings, and Mc-Kennee sat down at his desk to work. While seated he could not observe Mrs. Theriot, because there was a partition in the room. A few minutes later there was a knock at the locked laboratory door. McKennee got up and opened the door. The defendant entered, exchanged greetings with McKennee, and walked back, around the partition, to where his wife was working. McKennee testified that "there seemed to be some argument but [he] didn't hear any words." After approximately a minute, the defendant started to leave. As he was leaving, McKennee asked if he was Pat's husband, and the defendant nodded affirmatively.

A few minutes later there was another knock at the door. McKennee again opened the laboratory door for the defendant and returned to his desk. McKennee heard something that sounded like a "muffled yell" from Mrs. Theriot and also heard what he thought were four shots.[2] He ran around the partition and saw the defendant standing over his wife's body, with a gun in his hand. The defendant put his gun away as he was moving toward McKennee, brushed past him, and went out the door.

On cross-examination, McKennee testified that the defendant had a peculiar look in his eyes after the killing, that he did not think he smelled alcohol on the defendant's breath, and that all he could smell was gun powder. He could not recall whether the defendant had staggered, but he had glimpsed the defendant's walking and did not notice anything unusual about it.

The autopsy determined that Mrs. Theriot died as a result of multiple gunshot wounds in the head, neck, chest, and abdo-

---

[1] "LSB" is the "popular" name for this building on the Berkeley Campus.

[2] The witness testified that his immediate impression was that one of the laboratory machines had shorted.

men. Five slugs were found in the laboratory and another was removed from the victim's body.

Defendant was arrested shortly after 11 a.m. on the same day following an automobile accident near Los Gatos. The circumstances concerning his arrest are set forth in connection with the discussion of the issues.

Defendant testified that he and his wife were married in May 1944, while defendant was in the Army. While he was serving overseas, he learned that his wife had been unfaithful to him. On his return home to Baton Rouge, Louisiana, he had a "big hassle" with his wife about her unfaithfulness, and about her spending money and bonds he had sent home. He filed suit for divorce, and left for Chicago to attend the "Chicago Laboratory of Technology." He testified that, because of family urging, he reconciled with his wife at Christmastime of 1946.

In 1947, the defendant and his family moved to Oakland, where defendant was employed by Railway Express Agency from 1947 to 1949, by the United States Post Office from 1949 to 1958, and by the Department of Motor Vehicles from 1958 to the date of the offense. During this time defendant purchased a lot in the Berkeley hills, and, with the help of friends, built his own home. He and his wife had two boys, one born in 1953, and the other born in 1948. Mrs. Theriot worked both before and after her children were born, and in 1957 she started working at the University. At the time of the incident, Mrs. Theriot was earning $683 per month, and the defendant was earning $590 per month. During this period the defendant served on the executive board of the Dad's Club, and on the council of a local Boy Scout troop.

Defendant testified that he first became aware that his wife was involved with another man in December of 1963. One night that month he was returning home with his wife and a mutual friend when his car ran out of gas. The defendant left the car, walked to the friend's house to get the latter's car, returned, drove the friend home, and then took his wife to their home. He estimated that it took him over an hour to get the other car and return to where his own car was parked. He testified that on this evening his wife refused to have sexual intercourse with him for the first time.

Sometime in 1963, the defendant "got information" about his wife's relationship with this friend. He then visited an attorney for the purpose of obtaining a divorce. The attorney counseled the defendant in an effort to avoid the divorce. The

defendant persuaded his wife to visit her doctor, as advised by the attorney. The defendant testified that his wife complied, for a time, and that their marital situation improved for a short period.

In April of 1964, defendant testified that he confronted his wife and this friend with the fact that he was aware of their acts. Defendant also testified that, on another occasion, he inadvertently picked up the extension phone, and overheard his wife making a date with the friend.

He interrupted to tell the friend that his wife was not going to meet him, and his wife "clucked me across the head with the telephone." The defendant then left his home and went to his mother's house. He testified that the friend used to visit his home daily, and telephoned his home every morning at seven.

Defendant testified that he took his wife and children to Santa Cruz for the July 4th weekend.[3] When he returned to work after the holiday weekend, he was confronted by a fellow employee who asked about an article in the paper reporting that the defendant's wife had filed for a divorce. The defendant testified that this was the first time he had heard of the divorce, and he visited his wife at "LSB" to ask why she "didn't have the gumption to discuss" the divorce with him.

From July through November, the defendant lived with his wife. One day in August 1964, appellant twice visited "LSB" to look for his wife. He finally left a note for her. That evening he questioned his wife about where she had been during the day. When she replied that she had been at work the defendant told her about his visits, and "slapped her out of the chair in front of my two sons." Defendant testified that he "started wondering what was the matter with me or why would I do this in the presence of my two sons."

On another occasion in August, the defendant testified that his wife did not come home until 5 or 6 a.m., and they started arguing. He said that his wife called the police, he told them what the "trouble was. I told them the only thing I wanted her to do was to leave." The defendant testified that his wife did leave, and stayed with her sister in San Francisco. The defendant declared that because his sons kept asking about her he "picked her up and brought her back home."

On November 7, 1964, a hearing was had on the divorce action. Defendant testified that he was represented by counsel,

[3] The friend testified that either on July 4th or 5th of 1964, he, at defendant's insistence, had gone over to the defendant's house for drinks.

but that he was not given an opportunity to explain anything to the judge. The judge ordered the defendant to move out of his house, and to pay support for his two sons, who were to remain in his wife's custody. Defendant then moved to his mother's house in Oakland.

Defendant indicated he was very upset by the court's action. He felt everything had been taken from him. On November 10th, the defendant went up to his house to talk to his wife about a reconciliation. The defendant "pulled [his wife] from her bedroom to the car." Mr. John Worden, defendant's next door neighbor, was awakened from his sleep at 2:30 that morning by screaming and shouting beneath his window. Looking out, he observed Mrs. Theriot attempting to get out of a car, recognized as defendant's, which was parked in front of the Theriot house. Worden saw the defendant, who was seated on the driver's side, attempt to grab at his wife with one hand, and hit her with the other hand. Mr. Worden called the police, and started to the car.

Officers Szymanski and Wilson, of the Berkeley police, testified that they responded to this call. They arrived at the scene and questioned the defendant about what was going on. He responded that it was "a little marital difficulty." Officer Szymanski talked to the defendant, while Officer Wilson took Mrs. Theriot aside to talk to her. Moments later, Wilson yelled, "Mike, he's got a gun," and Szymanski grabbed the defendant by his shoulders and pulled him to the street. Defendant was searched and handcuffed, and the car was searched.

In the car the police found an unloaded gun, a partially consumed bottle of wine, and some loose bullets. Defendant declared the gun was in the car because he had taken his sons out to teach them how to shoot.

Mr. Worden, who had been present, and was approaching the house to talk to Mrs. Theriot, found some papers near defendant's car. These papers were given to the police. Defendant, at trial, admitted that, with few exceptions, the document was in his handwriting. The first page of these papers, as read into the record, is as follows: " 'Dear Joshua: I write to you because I wish you as trustee for my boys and my holdings in this so-called American society.

" 'I, Felton Theriot, do hereby appoint you, my brother Joshua C. Theriot, as the sole trustee and executor of my estate, which consists of the following: Two (2) sons, Felton,

Junior and Gregory Pierre Theriot, whom I love and hate to hurt this way. 1 family home, 1066 Cragmont, Berk., balance $10,000. 2, 1609 and 1611 Seventh Street rental; 3, 1615 - 84th Avenue rental; 4, life insurance, State of California, $9500; 5, life insurance, $1600 Cal. Life; 6, all—'

" 'It's a question of whether it's "the" or "other"—

" '—real and personal property for my sons.'

"Then there is another figure 1:

" 'Pat's life insurance, Prudential; 2, Pat's and my retirement. All other which we might'—

"You put a question mark there—the word is might—

" '—might have acquired as husband and wife, and I leave you as trustee for my sons.'

"Under that there are some figures, 22, under which is 70, a line under that, 1548. Then the figure 600 is under that, and then it is 21.40.

"Now, then the word 'over,' and on the rear of the document appears this:

" 'I know I have hurt you, mama, Mae, Greg and Felton. I know no other way out. I should have done this in 1946. It takes a lot of courage to me, but I did not want her to enjoy no more than I. Please try and make the rest of the family understand. Without her I did not want to live.

" 'Of course I know better, but my mind has been confused. Her sister, Rub and Alga Washington caused it all.

" 'The facts might never be known. You have proven to be a big brother and friend. Sorry.'

"And it's signed: 'Felton.' "
This page was in the defendant's handwriting.

Defendant testified that he wrote this testamentary disposition while he sat in his car, in front of his home, prior to entering it on November 10th. He testified that he was feeling despondent because of the court's action on November 7th, and at the time he wrote it he was contemplating suicide. He declared, in response to the court's questions, that he named his brother as guardian because he didn't feel that his wife would "take care of my boys adequately." He declared that, when he wrote the purported will, he had no intention of killing his wife. The listing of her insurance and her retirement pay, "Wasn't giving her life insurance or anything of that sort. I was listing all of our assets here, everything that we owned and we owned together." Defendant stated that the screams heard by his neighbor were his wife's reactions to his stating he wanted to commit suicide.

While the police were talking with the defendant, during the November 10th episode, they learned he was under the care of a private psychiatrist. Officer Wilson called the psychiatrist, Dr. Kenneth V. Everts, and on the basis of the conversation he concluded that the defendant was a danger, "not only to himself, but to his wife."

The policemen therefore delivered the defendant to Highland Hospital. Defendant was released around 6 p.m. and his brother and he decided that he would voluntarily commit himself to the Veterans Administration Hospital. After a week at the hospital he was released in the care of Dr. Everts, and visited the doctor until January. At that time he called and cancelled further visits.

On December 22, 1964, the defendant accompanied his wife, at her request, to a Christmas party in San Francisco. Later that evening, according to the defendant, an unknown party called the police and reported his presence at his home. When the police arrived, Mrs. Theriot informed them that everything was all right. The defendant was upset at being unable to learn the identity of the informant.

On December 31, 1964, defendant took his wife and children to a church service. In the following weeks he saw his wife on several occasions, and they also went to the Berkeley Family Service to seek marital counseling.

On January 22, 1965, the defendant was to have a dinner date with his wife. When he arrived to pick her up, Mrs. Theriot declared she did not want to go out to dinner because she was tired. At 10 p.m., after having some snacks and beer with his wife at a neighbor's home, the defendant left. He then went to the "Sportsman Club, and to the Showcase Club and . . . started drinking." He testified that when he overheard some people talking about money they had won at Reno, he decided he would drive up there. He left the club and drove to Reno alone, arriving early on the morning of January 23, 1965.

While in Reno, the defendant won some money and met an old friend, "Stonewall." Defendant decided he wanted to buy a gun. "Stonewall" accompanied him to the "Remedial Bonded Loan Office." "Stonewall" was known to the owner of the loan office, and provided identification for the defendant, who bought a gun in the name of Elton Sherman. When defendant was arrested, a receipt from the loan office was found in his pockets for a .38 caliber Smith and Wesson revolver, the weapon used to kill his wife.

Defendant testified that on Saturday morning, January 23, he called his wife, told her of his winnings, and told her that he wanted to commit suicide. He testified that she answered that if he returned to Berkeley sober, she would go out with him that evening. Defendant testified he was sober at the time of the telephone call.

Defendant offered a lift back to Oakland to a man he met while drinking, and also to a female friend of "Stonewall's." In the early afternoon, appellant, accompanied by the man, Sam Moore, and the woman, left Reno. Moore testified that he and the defendant had some drinks before leaving Reno, some sandwiches on the way back to Oakland, and that they shared part of a bottle of vodka that they had along, with Moore drinking most of it. They stopped at Truckee to rent chains. Later Moore began to drive, at his own suggestion. He said that he had noticed that defendant seemed to be driving too quickly, as if he were "sleeping with his eyes open." Moore drove the rest of the way, while the defendant slept. There was little conversation during the trip, but the defendant did indicate that he had purchased a gun for a friend while in Reno. Moore testified they arrived in Oakland about 8 p.m. on January 23d. Moore drove to his house where he got out, and defendant drove away.

A student who was working at "LSB" on the evening of the 23d testified that defendant arrived at the Lab shortly after Mrs. Theriot had left for the evening. The student, assuming that defendant was looking for his wife, told him that she had already left. The defendant thanked him and left. The student described the defendant as being quite normal in appearance.

Defendant testified that he remembered nothing from the time he felt drowsy while driving from Reno until he found himself in a police car of the campus police after the homicide.

Several coworkers of the defendant testified on his behalf. They declared that in the months after the divorce action was filed there was a change in the defendant's personality, as well as in his physical appearance. He was not as outgoing, he would not speak unless spoken to, he just sat around and stared, he seemed to have lost weight, and he seemed disturbed.

The accused friend testified that he had known defendant for several years. He denied any wrongful relationship with Mrs. Theriot. He admitted that the defendant had confronted

him about a supposed relationship with Mrs. Theriot, but denied that defendant took it seriously.

*Defendant's Statements*

■ Lieutenant Clarence Young and Sergeant Roger Goldsberry of the Los Gatos Police Department received a report of an accident on Highway 17, in the vicinity of Los Gatos. The report was received at about 11 a.m. on January 24, 1965. When the officers reached the scene, about 10 minutes later, they found the defendant sitting behind the wheel of a badly damaged 1952 Chevrolet which was situated "crossways on the southbound lane." The defendant was seated behind the steering wheel "just looking straight ahead."

The police officers approached the Chevrolet, but Lieutenant Young returned to the police car because of an incoming radio dispatch. This dispatch supplemented an original broadcast indicating that a vehicle, of the type described in the Los Gatos accident, was wanted in conjunction with a reported homicide. After the radio message was received giving the license number of the car, and indicating the occupant was armed, Young ran to Goldsberry and relayed this information. The officers approached the car with the intention of getting defendant out safely, both to protect themselves, since he was supposed to be armed, and to ascertain if he had been injured. They asked defendant several questions[4] about how he felt. They testified that all of the questions were apparently understood and that defendant's mind was alert. He responded immediately. He did not hesitate, nor did he stammer. Defendant at this time commented to the policeman, "You've got to take it easy on me because I work for the State." He further indicated, in response to the policeman's question, that he worked for the Department of Motor Vehicles.

The police officers testified that, at the time of this initial questioning, the defendant appeared to be "under the influence of liquor," and, although he responded to questioning, his motor processes, his hands, and his legs appeared to be affected. Both officers indicated that they smelled alcohol about the car and on defendant.

---

[4]The questions and answers were as follows: "Are you hurt?", "Yes, I think so." "Are you sure you're not injured? You had a pretty bad accident. Are you sure you're not hurt someplace?" "No. I think I'm all right." "Is there any blood on your hands?" "Well, did you get a bump on your head?" "No, no, I don't think so." "Well, do you hurt any place else? Do your ribs hurt? Do your arms or your legs hurt?" "No."

After the initial questioning, the defendant was asked to get out of his car. Defendant was then searched, handcuffed, advised that "anything you might say or do hereafter can be taken down as evidence and used against you in court and before you say anything of any kind, you're entitled to an attorney." Defendant nodded, but made no statement. Both officers assisted the defendant, who appeared wobbly on his feet, to the patrol car.

Sergeant Goldsberry then returned to the car to search for the weapon. During this period, a deputy sheriff, Michael Miller, arrived at the scene, and Lieutenant Young proceeded to direct traffic. Goldsberry, not being able to find any weapons, returned to the police car and asked the defendant, "Felton, where is the gun?" Defendant replied, "It's under the front seat on the driver's side." Goldsberry returned to the Chevrolet, and during his absence Deputy Miller also advised the defendant that "anything he might say could be held against him, and that he could remain silent and could also remain silent until an attorney of his choice was consulted." Miller then asked the defendant whether he had shot someone, and the defendant replied "Yes."

Sergeant Goldsberry found the gun, a Smith and Wesson .38 caliber six-inch revolver, later determined to be the death weapon, beneath the driver's seat. When Goldsberry returned with the gun, he asked defendant who it was he had shot, and defendant responded "My wife."

Defendant asserts that he was never properly advised of his rights, and that in any event he was too intoxicated to make an intelligent waiver. From the evidence set forth it is clear that there was substantial compliance with the requirements of the *Dorado* case. (*People* v. *Dorado* (1965) 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361].) The instant case was tried prior to June 13, 1966, and is therefore not subject to the standards enunciated in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. (See *Johnson* v. *New Jersey* (1966) 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772] ; *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221])

The questions of the defendant's ability to comprehend the admonition and waive it were resolved against him by the trial court on conflicting evidence which is hereinafter discussed.

In any event, it is clear that the preliminary questions regarding his state of health were not of a nature proscribed by

law, and were addressed to the defendant prior to taking him into custody. The statements which reveal the location of the gun and that he had shot his wife were admissions. No prejudice can be shown by their receipt in evidence. A further search of the car, which was warranted, would have revealed the revolver, and the testimony of the laboratory worker that the defendant shot his wife has never been controverted.

The statements, as answers addressed to questions by the officers, do throw some light upon the defendant's comprehension and general mental state. (See *People* v. *Wolff* (1964) 61 Cal.2d 795, 808 [40 Cal.Rptr. 271, 394 P.2d 959].) As used for this purpose they are similar to his understanding of, and answers to, questions concerning his state of health and his volunteered remark concerning his state employment.

No error is demonstrated in the admission of this evidence.

*Intoxication*

In addition to the facts last outlined above, the evidence relating to intoxication consists of the following:

Miller, the deputy sheriff, drove defendant to the county jail in San Jose. By the time Miller reached the jail, defendant was unable to walk, and he had to be "practically carried" up the stairs to the jail. Miller testified that he had originally formed the impression that the defendant was intoxicated, although he could not smell alcohol on his breath. The defendant seemed to be "getting drunker all the time."

An alcohol blood test taken at the county jail, about four hours after the accident, indicated a .25 percent alcohol content in defendant's blood.

The district attorney took a statement from the defendant at 2:50 p.m. on January 24, 1965 at the county jail. The district attorney stipulated that the defendant was drunk at the time the statement was made. The defendant introduced the statement into evidence without objection.[5]

"It has long been settled that evidence of diminished capacity, whether caused by intoxication, trauma, or disease, can be used to show that a defendant did not have a specific mental state essential to an offense." (*People* v. *Conley* (1966) 64 Cal.2d 310, 316 [49 Cal.Rptr. 815, 411 P.2d 911];

[5]The statement shows that the defendant refused to accept the fact of his wife's murder, and repeated some twenty odd times in ten minutes, "Go get Pat." When told someone murdered Pat, he asked, "Who did that to Pat?" He started crying during the course of the interview. He refused to accept statements that he killed his wife declaring "No. I loved my wife. I love her."

and see *People* v. *Ford* (1966) 65 Cal.2d 41, 51-55 [52 Cal. Rptr. 228, 416 P.2d 132]; *People* v. *Anderson* (1965) 63 Cal. 2d 351, 358 and 364-365 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 487 and 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 727-730 [31 Cal.Rptr. 225, 382 P.2d 33] [overruled on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]]; *People* v. *Gorshen* (1959) 51 Cal.2d 716, 731-734 [336 P.2d 492]; *People* v. *Baker* (1954) 42 Cal.2d 550, 571-574 [268 P.2d 705]; *People* v. *Sanchez* (1950) 35 Cal.2d 522, 526-529 [219 P.2d 9]; *People* v. *Tubby* (1949) 34 Cal.2d 72, 77-79 [207 P.2d 51]; *People* v. *Holt* (1944) 25 Cal.2d 59, 82-83 [153 P.2d 21]; *People* v. *Harris* (1866) 29 Cal. 678, 682-684.)

█ The question of whether the defendant was so intoxicated that he could not entertain the specific mental state essential to murder in the first degree is one of fact. (See *People* v. *Modesto* (1967) 66 Cal.2d 695, 703 and 707 [59 Cal.Rptr. 124, 427 P.2d 788]; *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900]; *People* v. *Conley, supra,* 64 Cal.2d 310, 324-325; *People* v. *Byrd* (1954) 42 Cal.2d 200, 213 [266 P.2d 505]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 883-886 [256 P.2d 911] [overruled on other grounds *People* v. *Green* (1956) 47 Cal.2d 209, 232 [302 P.2d 307]; *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]].)

█ Defendant, to show diminished responsibility, relies upon the evidence of his drinking habits, the testimony that he drank in Reno and on the trip back to Berkeley, the testimony that he had "a funny kind of look" in his eyes as he left the laboratory after the shooting, the officers' testimony of his condition at the time of his arrest, and the blood test administered four hours later. Without foundation, he calls for the conclusion that his companion took over the driving of the car on January 23d because of his intoxication, and for the assumption that he had been drinking from the time he returned Saturday night to the time he entered the laboratory. No evidence was presented regarding the significance of the blood test. (Cf. *People* v. *Modesto, supra,* 66 Cal.2d at p. 703; *People* v. *Ford, supra,* 65 Cal.2d at pp. 51-52 and 53; *People* v. *Conley, supra,* 64 Cal.2d at p. 315; *People* v. *Anderson, supra,* 63 Cal.2d at p. 358; *Jackson* v. *Superior Court* (1965) 62 Cal.2d 521, 531 [42 Cal.Rptr. 838, 399 P.2d 374]; and *People* v. *Ford* (1964) 60 Cal.2d 772, 789 [36 Cal.Rptr.

620, 388 P.2d 892].) It is obvious, however, that its significance, in relation to the defendant's condition at 9:30 a.m. the same day, is dependent on whether or not any alcoholic beverages were consumed by defendant between the time he left the laboratory (or at such time preceding as it would take any alcohol which he imbibed to be ingested into his blood stream), and the time of his arrest. It is conceivable that he had attained and maintained a level he could tolerate over the period from Friday night through Sunday morning, and that he subsequently drank a sufficient quantity to produce the result found at 3 p.m. (Cf. *People* v. *Anderson, supra,* 63 Cal.2d at p. 358.)

The trial court had before it the testimony of eyewitnesses who had observed the defendant in Reno and on the trip home, who had seen him at the laboratory the evening before the tragedy, who had observed him come and go after the shooting, and who had conversed with him and taken him into custody following the automobile accident. A review of this testimony reveals sufficient evidence to support a finding that defendant's mental faculties were not impaired from intoxication at 9:30 a.m. on January 24th. The evidence does not, as a matter of law, require a finding that there was such impairment.

*Psychiatric Testimony.*

The rule just discussed in connection with intoxication has been recently reiterated in its general application as follows: "It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue' in any case in which it is raised by substantial evidence. Its purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule. (See Lindman & McIntyre, The Mentally Disabled and the Law (1961) 355-356.) Under that rule a defendant is not insane in the eyes of the law if at the time of the crime he knew what he was doing and that it was wrong. Under the Wells-Gorshen rule of diminished responsibility even though a defendant be legally sane according to the M'Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree. This policy is now firmly established in the law of California. [Citations.]" (*People* v. *Henderson, supra,* 60 Cal.2d 482, 490-491, as quoted in *People* v. *Goedecke* (1967) 65 Cal.2d 850, 855-

856 [56 Cal.Rptr. 625, 423 P.2d 777]; and *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 876-877 [56 Cal.Rptr. 635, 423 P.2d 787]; and see *People* v. *Modesto, supra,* 66 Cal.2d 695, 707; *People* v. *Bandhauer, supra,* 66 Cal.2d 524, 528; *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 311-317 [57 Cal. Rptr. 608, 425 P.2d 208]; *People* v. *Sanchez* (1967) 65 Cal. 2d 814, 821-822 [56 Cal.Rptr. 648, 423 P.2d 800]; *People* v. *Ford, supra,* 65 Cal.2d 41, 54-55 : *People* v. *Conley, supra,* 64 Cal.2d 310, 316, 318-319 and 322-323; *People* v. *Anderson, supra,* 63 Cal.2d 351, 364-366; *People* v. *Wolff, supra,* 61 Cal. 2d 795, 822; *People* v. *Modesto, supra,* 59 Cal.2d 722, 727-730; *People* v. *Gorshen, supra,* 51 Cal.2d 716, 731-734; *People* v. *Baker, supra,* 42 Cal.2d 550, 569-571; *People* v. *Sanchez, supra,* 35 Cal.2d 522, 526-529; *People* v. *Wells* (1949) 33 Cal.2d 330, 343-357 [202 P.2d 53]; *People* v. *Harris, supra,* 29 Cal. 678, 683-684.)

■ "Defendant's plea of 'not guilty' to the charge of first degree murder put in issue the existence of the mental states that are elements of that offense, namely, intent, delibration, wilfulness, premeditation, and malice aforethought. [Fn. omitted.] (*People* v. *Henderson, supra,* 60 Cal.2d 482, 489; *People* v. *Modesto,* 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Gorshen, supra,* 51 Cal.2d 716, 733; *People* v. *Wells, supra,* 33 Cal.2d 330, 347.)'' (*People* v. *Conley, supra,* 64 Cal.2d 310, 318-319.)

It has been said that "A claim of diminished responsibility is defensive matter and must be raised by the defendant in the trial on the issue of his guilt." (*People* v. *Lookadoo, supra,* 66 Cal.2d 307, 316.) This statement can only refer to the burden of coming forward with evidence where the prosecution has made out a prima facie case of first degree murder. ■ In *People* v. *Thomas* (1945) 25 Cal.2d 880 [156 P.2d 7], the rule concerning the burden on the prosecution is stated as follows: "In order to establish murder of the first degree the burden is upon the prosecution to produce evidence which satisfies the minds of the jurors beyond all reasonable doubt not only that an unlawful homicide with malice aforethought was committed by the defendant but also that such homicide was of a type specifically enumerated in the statute as being murder of the first degree or was of equal cruelty and aggravation with those enumerated and was accompanied with a deliberate and premeditated intent to take life. 'When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption

of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' (*People* v. *Howard* (1930) 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; . . .'' (25 Cal.2d at p. 895; and see *People* v. *Bender* (1945) 27 Cal.2d 164, 179 [163 P.2d 8]; and *Jackson* v. *Superior Court, supra,* 62 Cal.2d 521, 525-526.)

Similar considerations apply to the application of section 1105 of the Penal Code which provides: ''Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.'' (See *Jackson* v. *Superior Court, supra,* 62 Cal.2d at p. 526; and cf. *People* v. *Howard* (1930) 211 Cal. 322, 330 [295 P. 333, 71 A.L.R. 1385].)

■ ''Evidence of the circumstances at the time of the killing, as well as the circumstances before and after the killing, is competent to show deliberation and premeditation. [Citations.] The manner and means employed to accomplish the killing are also important considerations in determining the degree of murder. [Citations.]'' (*People* v. *Lookadoo, supra,* 66 Cal.2d 307, 315; see also *People* v. *Hillery* (1965) 62 Cal.2d 692, 703 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 95 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Byrd, supra,* 42 Cal.2d 200, 213.)

■ ''[M]alice aforethought may be presumed from the circumstances attendant to the commission of an act.'' (*People* v. *Sanchez, supra,* 65 Cal.2d 814, 820; Pen. Code, § 188; see also *Jackson* v. *Superior Court, supra,* 62 Cal.2d 521, 526.)

■ On conflicting evidence the questions of the existence of the elements of malice aforethought and of the requisite deliberation and premeditation are for the trier of fact, and if there is sufficient evidence to sustain a finding adverse to the defendant such finding cannot be disturbed on appeal. (*People* v. *Modesto, supra,* 66 Cal.2d 695, 707; *People* v. *Lookadoo, supra,* 66 Cal.2d 307, 315; *People* v. *Sanchez, supra,* 65 Cal.2d 814, 821-822; *People* v. *Hillery, supra,* 62 Cal.2d 692, 702-704; *People* v. *Kemp* (1961) 55 Cal.2d 458, 471-472 [11 Cal.Rptr. 361, 359 P.2d 913]; *People* v. *Robillard, supra,* 55 Cal.2d 88, 93; *People* v. *Love* (1960) 53 Cal.2d 843, 850 [3

Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Baker, supra,* 42 Cal. 2d 550, 563; *People* v. *Daugherty, supra,* 40 Cal.2d 876, 885-886; and see *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 876; *People* v. *Ford, supra,* 65 Cal.2d 41, 51; *People* v. *Wolff, supra,* 61 Cal.2d 795, 820; *People* v. *Bender, supra,* 27 Cal.2d 164, 184; and *People* v. *Thomas, supra,* 25 Cal.2d 880, 885.)

On the other hand, if the evidence is insufficient, as a matter of law, to establish the requisite deliberation and premeditation, a conviction of first degree murder cannot stand. (*People* v. *Goedecke, supra,* 65 Cal.2d 850, 857-858; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 877-878; *People v. Ford, supra,* 65 Cal.2d 41, 51-55; *People* v. *Wolff, supra,* 61 Cal.2d 795, 823; *People* v. *Tubby, supra,* 34 Cal.2d 72, 78-79; *People* v. *Bender, supra,* 27 Cal.2d 164, 186-187; *People* v. *Holt, supra,* 25 Cal.2d 59, 92-93; *People* v. *Howard, supra,* 211 Cal. 322, 329-330; *People* v. *Kelley* (1929) 208 Cal. 387, 393 [281 P. 609].)

If the evidence is insufficient, as a matter of law, to establish any malice aforethought, a conviction of murder cannot stand. (*People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 413-414 [30 P.2d 1018]; *People* v. *Kelley, supra,* 208 Cal. 387, 393.)

Under the foregoing circumstances if the homicide is established the appellate court should reduce the offense to second degree murder (*People* v. *Goedecke, supra,* 65 Cal.2d 850, 858-862; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 878-883; *People* v. *Ford, supra,* 65 Cal.2d 41, 59; *People* v. *Tubby, supra,* 34 Cal.2d 72, 76, 80; *People* v. *Bender, supra,* 27 Cal.2d 164, 187; *People* v. *Holt, supra,* 25 Cal.2d 59, 93; *People* v. *Howard, supra,* 211 Cal. 322, 330), or to manslaughter (*People* v. *Bridgehouse, supra,* 47 Cal.2d 406, 414; *People* v. *Kelley, supra,* 208 Cal. 387, 393; and see *People* v. *Borchers* (1958) 50 Cal.2d 321, 330 [325 P.2d 97], and *People* v. *Sheran* (1957) 49 Cal.2d 101, 110 [315 P.2d 5]), as the case may be.

In *People* v. *Wolff, supra,* the court observed that, ''another and more substantial problem remains to be considered : the contention that the evidence is insufficient to support the trial court's finding that the murder was of the first, rather than the second, degree. This problem, however, is by no means new to us. In dealing with it we recognize that every relevant and tenable presumption is to be indulged in favor of sustaining the judgment of the trial court; but when a proper case appears (Pen. Code, § 1181, subd. 6) we do not hesitate to modify the judgment to murder of the second degree and affirm it

as modified." (61 Cal.2d 795, 818-819; followed in *People* v. *Goedecke, supra,* 65 Cal.2d 850, 855, and *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 876.)

The issues presented in this case narrow down to the question of whether the psychiatric and other evidence require a finding that the offense was second degree murder or manslaughter rather than first degree murder. A review of the more recent cases throws some light on the manner in which the psychiatric testimony should be evaluated in the light of all the facts.

In *People* v. *Wolff, supra,* "each of the four psychiatrists who testified at the trial stated (1) that in his *medical* opinion defendant suffers from a permanent form of one of the group of mental disorders generically known as 'schezophrenia' and (2) that defendant was also *legally* insane at the time he murdered his mother." (61 Cal.2d at p. 803.) The court reviewed the evidence of defendant's conduct and declarations, and concluded: "From the testimony . . . the jury could infer that even though some or all of the psychiatric witnesses concluded that defendant was 'legally insane' there was no basis for that conclusion under the California M'Naughton rule." (*Id.*, at p. 815.)

In approaching the question of the degree of the offense the court reviewed *People* v. *Holt, supra,* 25 Cal.2d 59, which determined that the statutory language "any other kind of wilful, deliberate, and premeditated killing" (Pen. Code, § 189) should be interpreted in accordance with the following principles: "Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again dividing the offense of murder into two degrees is a further recognition of that infirmity and of difference in the quantum of personal turpitude of the offenders. The difference is basically in the offenders but is to be measured by the character of the particular homicide." (25 Cal. 2d at p. 89, adopted 61 Cal.2d at pp. 820 and 822.)

The *Wolff* opinion omitted reference to *Holt's* reiteration of the rule of *People* v. *Howard, supra,* 211 Cal. 322, which stated: "To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, *the unlawful killing must be accompanied with a deliberate and clear intent to take life.* If the act be preceded by, and be the result of a concurrence of will, deliberation and intent, the crime of first degree murder is proved. (*People* v. *Bellon,* 180 Cal. 706 [182

P. 420].)'' (211 Cal. at p. 329, italics added; and see 25 Cal.2d at pp. 91 and 93.)

The court followed the following analysis from *People* v. *Thomas, supra*, 25 Cal.2d 880 at pages 899-900: ''[T]he more general words 'or any other kind of willful, deliberate, and premeditated killing,' following the specifically enumerated instances of killing which are expressly declared to constitute murder of the first degree, must be construed in the light of such specifically listed types and be held to include only killings of the same general kind or character as those specifically mentioned. By conjoining the words 'willful, deliberate, and premeditated' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill. . . . Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection.'' (See also 61 Cal.2d at p. 821.)

The court concluded in *Wolff*: ''In the case now at bench, in the light of defendant's youth and undisputed mental illness, all as shown under the California M'Naughton rule on the trial of the plea of not guilty by reason of insanity, and properly considered by the trial judge in the proceeding to determine the degree of the offense, the true test must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act. . . .

''Certainly in the case now at bench the defendant had ample *time* for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold, deliberated and premeditated conclusion. He did this in a sense—and apparently to the full extent of which he was capable. But, indisputably on the record, this defendant was not and is not a fully normal or mature, mentally well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understanding, reflection upon it and its consequences, with realization of the enormity of the

evil, appears to have been materially—as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached. We think that our analysis in *Holt* of the minimum essential elements of first degree murder, especially in respect to the quantum of reflection, comprehension, *and turpitude of the offender*, fits precisely this case: that the use by the Legislature of 'wilful, deliberate, and premeditated' in conjunction indicates its intent to require as an essential element of first degree murder (of that category) substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill." (61 Cal.2d at pp. 821 and 822.)

The language in the second paragraph just quoted was applied in *Nicolaus* where the court reduced the offense from first to second degree murder because the record showed that "both the expert and non-expert testimony established conclusively that defendant was not a normal person either mentally or emotionally." (65 Cal.2d at p. 878.) The opinions of the prosecution's psychiatrists which are set forth in the dissenting opinion were disposed of as follows: "Doctor Rapaport expressed the opinion that defendant was not mentally ill. However, notably absent from the case history related by him upon which his opinion was based are any references to defendant's previous bizarre and abnormal conduct given in detail in the histories relied upon by the defense psychiatrists, two of whom were court-appointed. Their testimony as to these abnormal actions is not only uncontradicted in the record but is substantiated by the evidence of other witnesses. Both prosecution psychiatrists were of the view that defendant could and did deliberate and premeditate the killings, but neither expressed an opinion as to the extent of defendant's ability to maturely and meaningfully reflect upon the gravity of his contemplated act." (*Id.*, at p. 878.)

In *Goedecke* the majority arrived at the same result on evidence which is summarized as follows: "Thus, although there was a direct conflict with respect to defendant's ability to form an intent to kill and to premeditate the killing, two psychiatrists saying that he had that ability and the remaining two taking the contrary view, there was no psychiatric testimony as to the *extent* to which defendant could *maturely* and *meaningfully reflect* upon the gravity of his contemplated act. In other words, even though we assume, as we must, that the trier of fact determined that defendant did have the men-

tal capacity at the time to form the intent to kill, this conclusion does not foreclose our inquiry in a perplexing murder of the kind here present as to whether the evidence was sufficient to find defendant guilty of murder of the first degree.'' (65 Cal.2d at p. 857).

In *Ford* the court summarized the evidence as follows: ''Except for the requisite mental capacity on the part of the defendant, it is clear that the murder of the deputy sheriff would be of the first degree.'' (65 Cal.2d at p. 51.) '' [I]n the instant case the testimony of the three psychiatrists that defendant was in a semiconscious or unconscious state when he shot the deputy sheriff and was not then able to deliberate or premeditate was not contradicted by any other evidence introduced by the prosecution. The prosecution presented no psychiatric testimony to rebut the evidence introduced by the defense. [Fn. omitted.] Without any such evidence to the contrary, we are unable to find that defendant could have formed or sustained the premeditation requisite to a conviction of willful, deliberate and premeditated murder, which is murder of the first degree (Pen. Code, § 189) punishable by death (Pen. Code, § 190).'' (*Id.*, at p. 55.)

From the foregoing it is concluded that even though the facts and circumstances might justify an inference that the defendant possessed and exercised the mental state necessary for first degree murder, psychiatric evidence which shows that he could not engage in the requisite premeditation and deliberation or entertain the specified malice may control the disposition of the case. (*Cf. People* v. *Love, supra,* 53 Cal.2d 843, 851; *People* v. *Gorshen, supra,* 51 Cal.2d 716, 736; *People* v. *Byrd, supra,* 42 Cal.2d 200, 213; *People* v. *Daugherty, supra,* 40 Cal.2d 876, 883-884; *People* v. *Danielly* (1949) 33 Cal.2d 362, 377-379 [202 P.2d 18] ; *People* v. *Wells, supra,* 33 Cal.2d 330, 357-358; *People* v. *Thomas, supra,* 25 Cal.2d 880, 904-905.)

With the precepts set forth above in mind the psychiatric evidence may be analyzed.

Dr. Everts, the only psychiatrist who had observed defendant prior to the homicide, testified that Theriot and his wife first came to him on October 24, 1964 for marital counseling. He saw them jointly twice, and on a subsequent occasion, when Mrs. Theriot came alone, he cancelled further appointments with her because she was consulting another psychiatrist. In November, when called, he advised the Berkeley police that commitment to the county hospital was advisable and that there was a possibility that defendant was capable of

suicide or murder, or any kind of violence. He knew defendant underwent voluntary commitment for a few days at a veterans' hospital following that incident. He had further appointments with the defendant on November 28, December 5th and 11th and January 5th. An appointment was made for January 11th but defendant phoned and cancelled all future appointments.

He observed that Mrs. Theriot was more cooperative in attempting to work out their marital difficulties than was defendant; that there was mention of long past infidelity on the part of the wife, but the doctor had no impression of any then current problem in that regard; that defendant's intemperance was one cause of the marital difficulties; that defendant was evasive, could not give detailed information and exhibited the defensive type of attitude of a person who is frightened about something; that he was avoiding reality factor and was not able to say he was wrong; that he was a sick—mentally sick—person who displayed the symptoms of ongoing depression; that it was "a downgrade worsening condition" and "he was going downhill rather than getting better."

The doctor expressed his diagnosis as of January 5th as follows: "I could certainly say that he was in a severe depression . . . I have not run any detailed examinations, but it's my impression that he was on the verge of being capable of doing almost anything. I know that he has a history of drinking but I never saw him while he was drinking, and certainly this would complicate it, and this made it also poor reasoning in light of their poor marital strife, because much of the turmoil was because of the drinking which he decided not to cut out."

The doctor was of the opinion that defendant did not have to be hospitalized so long as he was undergoing treatment, but that if asked on January 5th he would have recommended institutional treatment.

Neither side asked this witness for an opinion of defendant's mental capacity at the time he committed the homicide.

At the request of the district attorney, the defendant was examined by Dr. Burton W. Adams the day after the shooting. This psychiatrist also saw the defendant for about ten minutes by happenstance the following September 11th.

Dr. Adams' report, prepared in January, stated that the defendant was "in such a disturbed mental state so as to be unable to converse logically and relevantly with anyone, and, is unable to participate in any defense."

The doctor's testimony was in accord with the report. He stated that defendant's actions at the interview indicated to him that defendant was "actually in a psychotic state of mind." He testified that it was his opinion that the defendant was suffering from a true amnesia, but that he could not definitely say whether it occurred prior to the killing, or whether it was a result of guilt feelings after the killing. He described the defendant's condition on January 25th as "a dissociated or dissociative state. This is often to be considered as a kind of schizophrenic reaction with confusion and emotional turmoil and diminished awareness of surroundings and elements of that kind, . . ." He further stated that the ability to formulate an intent or to premeditate the commission of a criminal offense, of anyone in the above-described state, would be either seriously impaired or nonexistent.

Dr. Adams opined that on the basis of his January examination it would be very difficult to come to any definite conclusions about defendant's state of mind at the time of the shooting the day before. He acknowledged that the divorce, the defendant's exclusion from his house, his being deprived of the custody of his children, and his suspicions of his wife's infidelity were factors that would "involve an increasing disorganization of intellectual functioning" and "would . . . affect his ability to either formulate an intent or to premeditate about the commission of a criminal offense."

Defendant was next examined on April 18, 1965 by Dr. William McCaughey who, with Dr. Joseph C. Davis, was appointed by the court pursuant to the provisions of section 1027 of the Penal Code following the entry of defendant's plea of not guilty by reason of insanity. He testified that, as a result of his examination and the reading of the transcript of a subsequent interrogation of the defendant while he was under the influence of sodium amytal, he came to the conclusion that the defendant had the "capacity to form an intent to commit murder, to deliberate and to premeditate a killing." A hypotehtical question, framed by the participation of all counsel and the court, which purported to include all of the salient facts of defendant's background, produced a similar answer.

The court defined "deliberation" and "premeditate" to the witness,[6] and, upon defendant's counsel's interjection,

---

[6] "The word deliberate means to weigh in mind, to consider the reasons for and against, to consider maturely, to weigh the arguments for and against a proposed course of action. 'Deliberation' means careful con-

acknowledged that "in a meaningful way" should be added to the definition. The witness then indicated that the defendant had the capacity to formulate an intent to kill and premeditate as indicated in that definition. A similar answer was given in response to a question predicated upon a definition of intent suggested by defendant's counsel,[7] to which was appended "the matter of capability of formulating a mature and meaningful intent after meaningful reflection upon the gravity of the act contemplated."

The witness acknowledged that defendant's statements that he did not know why he killed his wife, and that he had often considered self-destruction, could be symptoms of mental illness, but were not such in his case. The doctor dismissed these factors, the circumscribed amnesia which he found, and the evidences of emasculation, all of which admittedly could be manifestations of mental illness, as "expressions or manifestations of his personality makeup."

On April 30th, Dr. Davis conducted his examination and concluded: "My examination failed to indicate that he was insane at the time [of the commission of the alleged crime]." He further stated: "The clinical information that I have and factual information that I have obtained by reading the reports [of subsequent psychological testing, and of the sodium amytal interview] . . . do not indicate to me that there was an inability to formulate an intent [to deliberate and to premeditate the killing of his wife]." He believed the defendant's amnesia was genuine, but that it "started after the act and blanked out a period of time preceding, and perhaps a short period of time following, the act."

His psychiatric evaluation concluded: "There is no evidence of overt psychotic symptoms, such as delusions, hallucinations, autism. There is no impairment of intellect or memory with the exception of the circumscribed amnesia related above. Psychiatrically this man gives a pattern of the

sideration and examination of the reasons for and against a choice or measure. The word 'premeditate' means to think over and resolve in the mind beforehand, to contrive and design previously. The law does not undertake to measure in units of time the length or period during which the thoughts must be pondered before it can ripen into an intent to kill. . . .''

[7] "'The unlawful killing must be accompanied with a deliberate and clear intent to take life, in order to constitute murder of the first degree. The intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.'" (See *People* v. *Thomas* (1945) 25 Cal.2d 880, 892 [156 P.2d 7].)

social conformity passivity and gregariousness. In addition to poor marital relationships which had existed since 1963 seemed to have reawakened some of the conflicts which were only partially resolved in 1946.''

This witness acknowledged that he understood the court's definitions (see fn. 6, *supra*). He was present during an ensuing discussion between court and counsel concerning the *Wolff* case and its use of the phrase ''maturely and meaningfully reflect.'' He was given defendant's suggested comment on intent (see fn. 7, *supra*), and stated he had excluded the probability that heat of passion was aroused by defendant's wife's alleged last statement of refusal to him. After rereading the transcript of the interview he said he ''got more of the feeling of some heated emotions, . . . on the part of Mr. Theriot,'' but he found evidence in that transcript that the defendant could have formulated an intent, so he could not say the defendant did not have such capacity. A lengthy hypothetical question composed by counsel for defendant, with additions from his adversary and the court, purported to place all the facts in the record before the witness. He indicated that the facts recited did not affect his previously announced opinion and that defendant had the capacity to premeditate with deliberation, as described legally, and kill his wife.

This doctor agreed that the defendant could be categorized as emasculated in the months following his divorce situation, that his diagnostic category of mental disorder fitted ''into the similar one that happens in war neurosis of disassociative personality, or . . . hysterical personality, where the individual unconsciously has amnesia or acute states of amnesia, and, accompanied by some secondary gain, always unconscious, to resolve a conflicting situation,'' and that although he was not a self-destructive person, there were periods when he had been depressed and he may have had thoughts of suicide. He concluded by stating that in his opinion the defendant was not schizophrenic because at all times he was close to reality, and that ''From my examination and from the information that, factual information that had been related to me today in Court, I still do not see, do not have any facts that would make me feel that he was incapable of premeditating in the sense of the rulings that have been read by the Court.''

Dr. Fariborz Amini testified for the defense. He said that he spent over 40 hours in studying defendant's case, some 22

of which he spent with the defendant himself, and that he first visited the defendant on July 3, 1965. Dr. Amini relied to some extent on psychological tests given by Dr. Lester Cohen, on an electro-encephalogram, on a skull X-ray, and on a sodium amytal interview.[8] He also collaborated with Dr. Bernard Diamond.

Dr. Lester Cohen, a clinical psychologist, made the psychological evaluation of the defendant at the request of Dr. Amini. He examined the defendant for a period of six or seven hours, on two occasions, in July of 1965. He testified that the paranoid personality he found would have existed six months prior to the testing, under ordinary circumstances. Dr. Cohen spent ''a couple'' of hours taking the defendant's history, and the rest of the time administering five different psychological tests: the Bender-Gestalt Test; the Draw-a-Person Test; the Rorschach Test; the Thematic Apperception Test; and the Wechsler-Adult Intelligence Scale.

Dr. Cohen's report to Dr. Amini may be summarized as follows: The basic theme of the defendant's account of his life was that he had tried to be a good person but fate had been harsh to him. He felt he was a ''victim'' because of actions attributed to his wife and others. The events defendant related indicated his wife had frustrated, deceived, used him, and had gone back on her promises to him. ''[I]n total these might serve to justify an act of violence against her.'' His wife did not come through as a real person, and many events he related seemed disconnected as well as psychologically perplexing. There was a possible indication of an organic condition.[9] His tests indicated that he was ''a rather

---

[8]Sodium amytal is a ''truth serum.'' It ''is administered in order to bypass . . . one's conscious and unconscious barriers towards recollecting events that are traumatic or painful . . . it is usually successful in recovering periods of amnesia.'' Defendant described the shooting twice. On the first occasion he said that his wife had pulled a gun first. She then gave him the gun ''and she cried and she cried.'' Dr. Amini testified that he believed this was referring to another occasion. In fact, whispers may be heard on the tape, indicating the doctors believe the defendant is confusing the killing with another incident. This type of confusion occurred throughout the tape. The defendant would start on one trend of thought, and then it would be clear from subsequent comments that he had switched to another subject. (Cf. *People* v. *Sheran* (1957) 49 Cal.2d 101, 111 [315 P.2d 5] (sodium pentothal); and *People* v. *Modesto* (1963) 59 Cal.2d 722, 732-733 [31 Cal.Rptr. 225, 382 P.2d 33] (hypnosis).

[9]Most of the subsequent testimony clearly indicated that it was unlikely that there was an organic injury, despite the defense's hopeful introduction of the evidence that defendant had, during his early youth, fallen on his head, and spent several weeks in bed recovering.

paranoid individual, . . . [in] his characteroligical style; but there was no indication of any delusional thinking. ... . He probably tries to see himself as a more aggressive and dominating person than he actually is, and has reacted against his tendency to be submissive and to placate others. He seems to have a basic sense of himself as being small and weak, or having to hide from what is seen as a basically threatening world. Yet he does have a strong need to strive and achieve, being driven by very high inner standards which are essentially unreachable. He may then attribute his lack of success to the hostility of others rather than to his own limitations. His sense of himself as any kind of sexual person also seems poorly developed; . . . Significant issues re his parental family seem to be an incomplete separation from mother and a troubled identification with his father. Overall, then, [he] would appear to be a basically paranoid character, with strong masochistic features. . . . I would not feel able to speculate on what the condition of his mind may have been at the time of the murder.''

Dr. Cohen's testimony was similar to his report. He characterized the defendant as a latent schizophrenic. He stated that ''at the time of the testing, [Theriot] was probably not psychotic in terms of being very severely mentally ill or severely out of contact with reality or severely withdrawn or showing any unusual disturbances. I did not feel definitely that he was psychotic. . . . My feeling was that he was essentially a kind of paranoic personality.''

Dr. Amini declared that there was no evidence of organic brain damage. He believed the defendant had a true amnesia, rather than a feigned amnesia. Dr. Amini was of the opinion that the amnesia was retrograde, that is, it had occurred after the killing. The doctor declared that since the defendant did not have a memory of the events surrounding the killing, he felt it necessary to perform the amytal interview in order to be able to testify as to defendant's state of mind at the time of the killing.

The amytal interview was conducted by Drs. Amini and Diamond, and the tape of the interview, as well as a transcript of the tape, were received into evidence.

The tape consists of a largely garbled first section where the drug is taking effect. For portions of the tape Dr. Amini struggles to keep the defendant from going too far under the influence of the drug, and falling asleep. Relevant portions of the tape, taken out of context, are that the defendant believed

his wife was having sexual relations with his best friend. On the day of the killing he went to his wife's work place. In response to the question: "Do you remember why you shot her, how you felt about it when you shot her," the defendant replied that he did not remember why he shot his wife. He declared: "No. I love Pat. I really love Pat. I should have shot myself." He declared that he killed his wife on an impulse. He said: "I didn't plan to shoot her. I went in and she promised me a date and then she said, you are not going to have a date, and she said it in a sarcastic . . ." He also said that he went into "LSB" and told his wife that he wasn't drunk, and he wanted her to go. He said that his wife answered that he was a fool, and that "it is all over, . . . I have the house, I have the kids, . . . what do I need with you?" The defendant testified that he showed his wife the gun, and she said: "Lordy, Felton, no," and agreed to go with him. He said he then "aggravated the thing," and his wife said she was not going. He indicated that he then shot her. In response to the question, was he in his right mind when he shot his wife, the defendant replied: "I don't think so, but. . . . If you would give me a gun now and tell me to shoot her. . . . Well, Dr. Diamond, I had nothing to gain." The defendant was again asked why he shot his wife, and answered: "I had nothing to lose."

As a result of the psychiatric examination of the defendant's present mental state, his relationship with his wife, the deterioration of his emotions, and the amytal interview, Dr. Amini concluded that the defendant "did not have the capacity to premeditate and form an intent in a meaningful way." He did not dispute that there was a degree of thinking, "but how well these thoughts were weighed, how these thoughts were connected, whether this was deliberation and meaningful reflection of a mature man or that of a disturbed man is what we're talking about. . . ." "If, by deliberation and premeditation we mean to be able to weigh reasons for and against, if we mean in a meaningful way reflect on the nature of his act, he was not capable of doing it."

In response to a definition read by the court (fn. 6, *supra*) the doctor stated that the defendant did not have the capacity to deliberate and premeditate the killing "Because he was in such a state of mind that he could not reason, he could not carefully weigh facts for and against. He could not think clearly about the emotional impact of what the act he was

doing. He was not in general, capable of reasoning about anything about the nature of his act.''

From the foregoing evidence it is clear that the trial court was faced with conflicting opinions as to the mental capacity of the defendant at the time of the shooting. It apparently adopted the opinion that the defendant had the capacity to entertain the requisite mental state, and that, among other facts, the November incident, his purchase of a revolver, and the firing of six shots at his wife evidenced the exercise of premeditation and deliberation and the necessary malice.

Defendant seeks to come within the ambit of *Wolff, Ford, Nicolaus* and *Goedecke*. His first contention is that the prosecution's expert witnesses were not queried regarding the defendant's ability to reflect maturely and meaningfully (cf. *People* v. *Goedecke, supra,* 65 Cal.2d 850, 857, as quoted *supra*). As shown above that concept was before the court and each of the expert witnesses during their interrogation. Similarly it is clear that the court was familiar with the *Wolff* case and the terminology used in it and the following cases. The judge's comments[10] do not show a disregard or misunderstanding of the rule, but demonstrate that he considered his own questions as embracing the concept set forth in *Wolff*.

[10]''I think the psychiatrist has that in mind, but I don't think the cases go far enough to say that the intent required in first degree murder, that a man sits down and says, 'Should I kill this person? Maybe I shouldn't kill them. What would I gain by killing? What would I lose by killing? I'm going to weigh these on a scale. I'm going to deliberate on them a while. And now I'm going to kill that person, and so forth.' I mean, the law doesn't require that kind of a situation and I think, with what Mr. Dell'Osso said, you understood. I think that goes right along with what I say. It's a little extension of the rule in that it talks about the meaningful situation, but I think it has to be meaningful to comply with the construction that I gave here.''

(Consideration of the use of the word ''meaningful'' can produce some paradoxical results. Theoretically any reflection which resulted in the decision to take life would not be meaningful unless that act was sanctioned by contemporary morals. To the Nazis genocide was meaningful, but subsequent events reversed that concept. Presently, over the protests of vigorous minorities, it is meaningful to kill certain murderers, to kill certain South Asiatics who entertain different political beliefs, and to order our sons to their death in pursuit of this purpose formed by meaningful public political reflection. If there is to be any first degree murder solely on the ground that the killing is the result of ''mature and meaningful reflection'' the word ''meaningful'' must mean comprehensible within the realm of a concept of what is normal human mental and emotional fallibility. It should be understood that this test of responsibility may lead to more severe punishment for the normal individual, to whom will be attached greater turpitude, although he may not be so dangerous to society as a whole; and that the abnormal, though not legally insane individual, will be subject to less penal control by society, although he may present it with a greater threat to its safety.)

(See *People* v. *Gorshen, supra,* 51 Cal.2d 716, 734-735; and *People* v. *Rittger* (1960) 54 Cal.2d 720, 729-731 [7 Cal.Rptr. 901, 355 P.2d 645].)

Despite the foregoing conclusions, the sufficiency of the evidence to establish that defendant did in fact actually exercise the requisite premeditation and deliberation and entertain malice aforethought is questioned.

Since the evidence is sufficient to sustain a finding that the defendant had the mental capacity to act with malice aforethought (cf. *People* v. *Conley, supra,* 64 Cal.2d 310, 318-323), the evidence that he shot his wife six times is sufficient to support the implied finding that malice was established. (*People* v. *Bender, supra,* 27 Cal.2d 164, 178; *People* v. *Warrick* (1967) 249 Cal.App.2d 1, 5-6 [57 Cal.Rptr. 121]; *People* v. *Todd* (1957) 154 Cal.App.2d 601, 609-610 [317 P.2d 40].)

On the question of premeditation, the trial court could properly consider the early marital infidelity, the relationship between the parties since the victim had filed for divorce, including the implications that the defendant was contemplating murder-suicide at the time he composed the November note, the fact that he had committed other acts of violence against his wife, the fact that he was manifestly upset with the divorce and the attendant ouster from his house and deprivation of the custody of his children, and the fact that he purchased a weapon under an assumed name. The defendant's amnesia, which all who ventured an opinion agreed was bona fide, leaves the question of just what transpired at the time of the shooting unanswered except as it may be said to be revealed by the "truth-serum" interview. The whole of the evidence permits the inference that he came prepared to kill his wife alone, or his wife and himself together, unless he could arrange for a reconciliation.

The following from *People* v. *Smith* (1964) 229 Cal.App.2d 511 [40 Cal.Rptr. 399], is pertinent: "Defendant had been rebuffed and frustrated ever since he had left jail. It could have been reasoned that if he had not expected to be refused admittance, as he had recently been refused, he would have had no occasion to carry a gun in his car; he would not have placed the gun in his pocket when he left the car and started toward the house if he had not intended to use it in case he should be denied admittance to the house. *With good reason the court could have concluded from the same evidence as that considered by the psychiatrist* that over the years defendant had suffered repeated wrongs at the hands of Earnestine, had

brooded, meditated and deliberated over the same and after his release from jail had decided upon a course of conduct, namely, that he would go to the house in which he would find Earnestine, would demand admittance, and if he should be rejected he would repay her. for all the wrongs she had inflicted upon him by shooting her to death, and thus put an end to an intolerable and hopeless relationship.

 "As a reviewing court we do not have the ordeal of the trial court of weighing the conflicting inferences from circumstantial evidence which shed light upon the thinking, the motives, the purposes and intentions of the perpetrator of a homicide, and of determining whether the act was committed with premeditation and deliberation. We consider only the legal sufficiency of the evidence to support the verdict or judgment. The leading case of *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], analyzes and develops clearly the distinctions between murder in the first degree and in the second degree. All killing to be murder must be done with malice and an intent to kill, but to be murder of the first degree that intent must have been formed with deliberation and premeditation. Applying the criteria laid down in *Bender* to the instant case it cannot be said that the judge drew unreasonable inferences when he concluded from all the evidence that the appellant had formed an intent to shoot his wife to death after deliberately making up his mind to that course." (229 Cal.App.2d at pp. 516-517, italics added.)

It has been uniformly held that if the evidence is legally adequate to support a finding of murder of the first degree an appellate court is not authorized to reduce the judgment because it entertains a doubt as to weight of the evidence. (*People* v. *Thomas, supra,* 25 Cal.2d 880, 904-905; *People* v. *Love, supra,* 53 Cal.2d 843, 850-851; *People* v. *Byrd, supra,* 42 Cal.2d 200, 213; *People* v. *Daughterty, supra,* 40 Cal.2d 876, 883-886.; *People* v. *Odle* (1951) 37 Cal.2d 52, 55-56 [230 P.2d 345]; *People* v. *Hills* (1947) 30 Cal.2d 694, 701 [185 P.2d 11]; *People* v. *Clark* (1967) 250 Cal.App.2d 681, 686 [58 Cal.Rptr. 660]; *People* v. *Smith, supra,* 229 Cal.App.2d 511, 517; *People* v. *Woods* (1958) 166 Cal.App.2d 671, 676 [333 P.2d 445]; *People* v. *Cartwright* (1956) 147 Cal.App.2d 263, 268 [305 P.2d 93]; *People* v. *Webb* (1956) 143 Cal.App.2d 402, 422-424 [300 P.2d 130]; *People* v. *Pope* (1955) 130 Cal. App.2d 321, 325 [279 P.2d 108]; *People* v. *Werner* (1952) 111 Cal.App.2d 264, 270-271 [244 P.2d 476]; *People* v. *Coston* (1947) 82 Cal.App.2d 23, 30-34 and 37-39 [185 P.2d 632].)

In *Coston* this court distinguished the earlier cases which permit a reduction in the degree of the offense as follows: "In *People* v. *Kelley*, 208 Cal. 387 [281 P. 609], the killing occurred during a drunken orgy. The homicide was reduced from first degree murder to manslaughter because there was no evidence of malice, deliberation or premeditation. In *People* v. *Howard, supra*, (211 Cal. 322), the court reduced the homicide from first degree to second degree murder. There the defendant killed his roommate. There was no evidence of the circumstances of, nor the reason for, the killing, except the defendant's confession. This confession established only second degree murder. In *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8], the conviction of first degree murder without recommendation was reduced to murder in the second degree. There the killing was accomplished in a drunken orgy and there was no proof of malice or premeditation or deliberation. In *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21], the conviction of first degree murder without recommendation was reduced to second degree murder. There the decedent kept advancing towards the defendant, after a warning shot by the defendant and a warning not to come closer. . . . In none of these cases were the facts similar to those in the case at bar." (82 Cal. App.2d at p. 33.)

In *Clark* the court noted that *Goedecke, Nicolaus* and *Wolff*, upon which defendant relies in this case, were factually dissimilar from the uxoricide before the court in that case. (250 Cal.App.2d at p. 687 [58 Cal.Rptr. 660].) In this case, unlike *Clark*, there is expert medical evidence tending to establish the defendant's diminished capacity. It is, however, disputed and conflicting, and the facts presented here, although subject to conflicting inferences, do not present such a bizarre and incomprehensible killing as is found in each of those cases.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 27, 1967.