[Crim. No. 4427.    Third Dist.    Jan. 29, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MARTIN REYES JUAREZ, Defendant and Appellant.

John M. Beede, Public Defender, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant Juarez (32 years of age), a Mexican-American farm laborer, killed his paramour, Barbara DeJaeger (30 years of age) after, and apparently because, she had left him because of his cruelty. He also killed another young man, Arlo Ellingson (32 years of age) who happened to be present among others at the Woodland, Yolo County, home of the woman to which the first victim had gone earlier on the day of the killings. The charge was murder. The case was tried by the court. The sole defense then, as here, was that of "diminished capacity." A plea of not guilty by reason of insanity was withdrawn during trial. The court adjudged the killing of the victim Barbara to be first degree murder and sentenced defendant to life imprisonment therefor. Killing of Ellingson was adjudged to be murder in the second degree. The sentence: the term prescribed by law, said sentence to be served simultaneously with the first sentence. On appeal defendant urges that "diminished capacity" had been demonstrated as a matter of law; that error was committed in the court's failure to take into consideration all of the evidence bearing upon that issue; that the court's misunderstanding of the law is demonstrated by the fixing of different degrees of murder because the killings were based upon the same facts as to intent. We affirm the trial court. There was substantial evidence that the killing of Barbara was premeditated murder, that the killing of Ellingson was with an intent to kill and with malice aforethought. There was also substantial evidence justifying the court's finding that the rule of "diminished capacity" was inapplicable to reduce either the degrees of murder or to reduce the crime to voluntary manslaughter.

Defendant did not testify in his own behalf at the trial. The two adult survivors present during the killings were witnesses for the prosecution. They were Juanita Anderson, a 51-year-old cripple, and Allen Johnston, a friend of the victim Ellingson. The record shows without substantial conflict the events of the day of the killings.

Barbara, after mistreatment by defendant (described by other witnesses), had left him. She, with her two children, one six years old and the other aged 17 months, had sought sanctuary at the home of Mr. and Mrs. Anderson. Defendant visited this residence at about midday of July 26, 1966. He talked with Barbara outside the house for 20 or 30 minutes. Then he left. During the afternoon he made seven or more telephone calls to the Anderson home. Some of them were answered by Mrs. Anderson, some by Barbara. Barbara refused to return to live with defendant. She also refused to talk with him on the occasion of the later calls. At around 6 o'clock in the evening, defendant was seen crossing the Anderson lawn.

Ellingson lived in a trailer at a trailer court in Yolo County with Allen Johnston. Sometime during the early evening, Barbara with her children visited Ellingson at the trailer. Johnston, returning from dinner, found the two in the trailer watching television. The children were playing. Johnston was introduced to Barbara. Ellingson asked Johnston to accompany them while he drove Barbara back to the Andersons. He did so.

Meanwhile, defendant had phoned Father Arnold Meagher, a Roman Catholic Priest, about 9:30 p.m. The priest was unacquainted with defendant. Defendant said he had a serious problem and would like to talk to a priest. He said his wife with whom he was very much in love had left him. He added he had not been as good to his wife as he should have been. He was highly emotional. He said he had been drinking all day. The priest, busy with another appointment, told defendant he could not see him but would in the morning, and he advised him to drink some coffee and ''go to bed.'' Defendant hung up the telephone. He gave no indication he intended any violence.

When Ellingson, Barbara, the children and Johnston reached the Anderson home, the men stayed to visit with Mrs. Anderson and have a beer. Mr. Anderson was not at home. The adults were all seated in the living room. Mrs. Anderson sat on a davenport. Barbara sat on the arm of an overstuffed

chair. Ellingson was seated on the other arm. The chair was across the room from the davenport. The infant was placed on a blanket on the floor to sleep. The older child was playing. Johnston's position is not indicated. The group watched television while drinking beer.

After a very short while, and at about 10 to 10:15 p.m., they were interrupted by the sound of a somewhat violent opening of the unlocked kitchen door leading outside. Defendant then appeared in the archway between the kitchen and living room. He was carrying a shotgun which he cocked. Mrs. Anderson screamed and cried: "Get out, Marty." Defendant exclaimed: "You have had it, Barbara." Barbara stood up as if to run to protect her children. At close range defendant shot her in the region of the stomach. She fell backwards into the chair. Ellingson had risen. Defendant said: "I am going to kill everyone of you." Ellingson said: "This isn't what it looks like." Defendant then shot him and he fell to the floor. In reply to defendant's declarations, Mrs. Anderson had cried: "Why?" and stated they had not done anything to hurt defendant; but defendant replied they were all responsible for Barbara having left him. The older child, referring to Mrs. Anderson, said to defendant, "Don't hit my Tiny." After shooting Ellingson, defendant stepped even closer to Barbara and shot a shell into her prone body. Then he turned and left.

Both Ellingson and Barbara died at the scene of the shooting. After shooting Barbara the first time, defendant had reloaded the gun between each shot fired thereafter. A shell was still in the magazine when defendant was apprehended later.

Mrs. Anderson and Johnston both testified that defendant gave no indication of excessive drinking. He did not stagger, his speech was not slurred. There was nothing unusual about his appearance. The trial judge reasonably could have concluded that this testimony was credible. Neither Mrs. Anderson nor Johnston had been drinking heavily. (Their drinking at the Anderson home had only reached a quarter consumption of a first can of beer at the time defendant had arrived.)

After leaving the Anderson residence, defendant drove his pickup truck five and a half miles back to his home. Either before or after that, he called the sheriff's office. He also called the foreman of the farm where he worked, telling him of the shooting. His voice sounded normal over the telephone. When defendant was apprehended a blood-alcohol test given

by a deputy coroner showed an alcoholic content of 0.21. There was a partially empty six-pack of beer in the defendant's vehicle. Excepting for a story which defendant related to others, there is no evidence whether the beer had been consumed before or after the killing. (To others, defendant said he had consumed two and one-half six-packs of beer that day, all before the shooting.) At the time of his arrest he was emotional, sobbing, walked without staggering, talked clearly and was described as being not incapacitated.

### DEFENDANT'S BACKGROUND

Lucille Juarez (39) defendant's wife, was a defense witness. The couple were married in 1962 and had cohabited for seven months prior to the marriage. They had separated in April 1966. Mrs. Juarez described a life with defendant which can be characterized as stormy. Typically there were intermittent but frequent bouts of drinking by defendant followed by periods of sobriety. When drunk he was jealous, became angry, unjustifiably accused her of infidelity, abused her verbally and physically, performed other acts of violence. These would be followed by periods of remorse during which defendant was extremely loving and kind. Several times during his enraged periods she had had to cause his arrest and he had served several jail sentences for assaulting her. She described an incident in September 1964 when defendant had torn up his clothes and hers and had wrecked a bar which the wife owned and both operated in Fresno. On one occasion in a drunken rage, he had carved the name "Leonard" in a mattress in the process of destroying it. Mrs. Juarez' testimony regarding the bar-destroying incident was corroborated by a deputy sheriff, a defense witness. Other defense witnesses corroborated Mrs. Juarez' testimony regarding beatings administered and anger displayed by defendant when drunk. The evidence shows defendant weighs 120-130 pounds, while Mrs. Juarez is described as a woman weighing 200 pounds.

Included in the wife's testimony was the fact that after one of defendant's episodes of violence he had been committed to the mental ward of the Fresno County Hospital for a period of a week. There he had been examined by a psychiatrist and had been released.

With one exception, we have outlined the material facts with sufficient detail. The exception is an analysis of the psychiatric testimony. We think that will be more understandable following a discussion of the applicable law.

## The Doctrine of Diminished Capacity

Fundamental, of course, to the controversy but elementary are the definitions of murder and of first degree murder. "Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) Excluding its special forms, "All murder which is . . . wilful, deliberate, and premeditated" is murder of the first degree. (Pen. Code, § 189.)

A doctrine sometimes referred to as "diminished capacity," sometimes as "diminished responsibility," had its origin in California in *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]. It was later applied in *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]. It is now sometimes spoken of as the "*Wells-Gorshen*" defense. Its scope as applies to *mental illness* up to its development in 1963 has been stated in *People* v. *Henderson*, 60 Cal.2d 482, at pages 490-491 [35 Cal.Rptr. 77, 386 P.2d 677] as: "Under the *Wells-Gorshen* rule of diminished responsibility even though a defendant be legally sane according to the M'Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree. This policy is now established in the law of California [citations] . . . ." There have been developments of the doctrine in California Supreme Court decisions since 1963. For example, in *People* v. *Goedecke* (1967) 65 Cal.2d 850, 857 [56 Cal.Rptr. 625, 423 P.2d 777], an ability to "*maturely* and *meaningfully reflect* upon the gravity of his contemplated act" was held by the majority of the court[1] to be a necessary ingredient of wilful premeditation where (1) the crime was a bizarre killing by defendant of his mother, father, brother and sister, an act "completely foreign to . . . [defendant's] character and . . . relationship with his family" (p. 858); (2) defendant had a schizoid personality but did not have the psychotic illness known as schizophrenia; and (3) two psychiartists had testified he did not have the capacity to form the intent to plan to kill whereas two other psychiatrists had stated he did. Other mental illness cases applying the diminished capacity doctrine are: *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 876-881 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 315-316 [57 Cal.Rptr. 609, 425 P.2d 208]; *People* v. *Steele*, 237 Cal.App.2d 182, 183-191 [46

---

[1]Justices Mosk and McComb dissented.

Cal.Rptr. 704]; *People* v. *Hoxie* (1967) 252 Cal.App.2d 901, 905 [61 Cal.Rptr. 37]. We avoid redundancy by reference with approval rather than quotations to the last cited case (*Hoxie*) as a source of tracing the development of the diminished capacity doctrine.

Intoxication may be a basis of diminished capacity either as a concommitant of mental illness as in *People* v. *Ford* (1966) 65 Cal.2d 41, 51-55 [52 Cal.Rptr. 228, 416 P.2d 132], and *People* v. *Conley* (1966) 64 Cal.2d 310, 319-320 [49 Cal.Rptr. 815, 411 P.2d 911], or intoxication, where the existence of any other mental illness is not demonstrated. (See *People* v. *Anderson* (1965) 63 Cal.2d 351, 365 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Theriot*, 252 Cal.App.2d 222, 236-238 [60 Cal.Rptr. 279].) Here reliance by the defense was upon a mental illness alcoholically related. It is called ''alcoholic paranoia.''

Defendant produced a psychiatrist, Dr. Thompson, who gave his opinion that defendant was an alcoholic paranoid incapable of premeditation at the time of the killings. The prosecution produced two psychiatrists. The testimony of each was that defendant was, to them, clearly not an alcoholic paranoid; neither was he, at the time of the killings, otherwise incapacitated. To them he was capable of mature and meaningful reflection of the gravity of his acts, thus capable of premeditation.

On the issue of the sufficiency of the evidence to support the judgment, it is our duty to uphold the judgment if substantial evidence supports it. (*People* v. *Ford, supra,* 65 Cal.2d at p. 51.) We shall, therefore, analyze the testimony of the prosecution's experts first.

The prosecution's psychiatrists were Dr. Reginald Rood, assistant superintendent of Napa State Hospital, and Dr. Amino Perretti, a staff psychiatrist at the same institution. They examined defendant together. Their opinions were based upon a clinical psychiatric examination of, or history taken from, defendant himself, fortified by a consultation with defendant's wife, Lucille Juarez. Defendant gave them a history of a childhood where he was a rejected, unhappy, insecure boy raised by an alcoholic mother and a stepfather. His early life had been, as one doctor expressed it ''traumatic and difficult.'' (He had told the defense psychiatrist he was an illegitimate child.) In the household where he was raised were two half brothers who had thereafter led normal adult lives.

Defendant told the psychiatrists that he had been in the army and had received a dishonorable discharge as the result of a jeep stealing episode. During his tour of duty in the army, he had been in Germany where he had formed a liaison with a girl, Ursula. His treatment of her had been typical of his later treatment of his wife and Barbara: loving care when he was sober, beatings administered when he was intoxicated. Ursula had told him she was pregnant and he became angry, accusing her of having become pregnant by another man. Otherwise, his history given was a summarization of the facts we have already stated as related by his wife—including the bar wrecking, mattress tearing episodes, jail sentences, and the confinement in the Fresno mental ward with the psychiatric examination there; also of the events of the day of the killing as related by the eyewitnesses. Significant to the doctors was his account of his relationship with Barbara, both generally and on the day of the killing. His affair with Barbara had been preceded by a separation from his wife. That had not displeased him. She had become repulsive to him since he regarded her as an extremely unattractive female. Defendant also told the psychiatrists he had been sexually normal with other women, particularly Ursula, the German girl, and Barbara. He said he was very much in love with Barbara.

Of the utmost importance in the ultimate diagnosis of both psychiatrists was (1) defendant's *clear account* of the events of the day of the killing, (2) the fact that when sober defendant realized that there was no justification for his jealousy either in the case of Mrs. Juarez or Barbara. He stated that neither had been unfaithful to him. When sober he did not suspect either of infidelity.

When Barbara left him he "brooded" first, became grief-stricken, and then became progressively enraged. As the day wore on and he became convinced from his visit and telephone calls that Barbara would not return, he decided that if he could not have her no other man would. He did not suspect that she was then intimate with any other man but thought she probably would become so later if they remained separated. He decided to kill her. He commenced to drink beer. He told the doctors he consumed about two six-packs. As to his alcoholic condition, defendant told the doctors "he was intoxicated but not crazy." As he had continued his drinking his inhibitions were released and his decision to kill Barbara became more fixed. Then he acted on this decision.

He left his home and drove the five miles to the Anderson home. He described the events of the killing in detail and—most significant to the doctors—with the same precise detail as the step-by-step events had been described by the testimony of the eyewitnesses. He had killed Ellingson, he said, because Ellingson stood up and he thought he was coming towards him to disarm him. He had then fired another shot into Barbara. He said he had loaded his gun with a shell to kill Barbara before he had left his home. After the killing he had returned to his home, driving his pickup. He had then telephoned the sheriff.

Effectually, Doctors Rood and Perretti each described the killing as the act of a sane, emotionally immature and unstable man, under the influence of alcohol, consumption of which had been to an extent which released his inhibitions and permitted him to perform an act motivated by a complex of grief, love and hatred. Dr. Rood testified there was no insanity, or false perception, or false ideation. Dr. Perretti referred to the fact there were no hallucinations, no psychotic behavior.

Both psychiatrists positively ruled out any psychotic condition, including alcoholic paranoia. The symptoms of that mental illness were stated to be: (1) delusions of infidelity, (2) impotence, and (3) (usually) signs of organic deterioration such as a failure of memory. Dr. Perretti testified that "these alcoholic paranoids have delusions of infidelity, *when sober.*"[2] (Italics ours.) The examination of defendant showed he, to the contrary, knew when sober that both his wife and "common law" wife were "faithful to him."[3]

The opinion of both doctors may be illustrated by the following excerpt from the testimony of Dr. Perretti: "Q. Doctor, from what you know of the history of the case as related to you by the defendant, do you have an opinion as to whether

---

[2]Dr. Perretti testified: "Alcoholic paraonia is where they would have a falsification of memory, filling the gap of memory with fiction."

[3]The doctors' ruling out of alcoholic paranoia may be illustrated by the following excerpt from the testimony of Dr. Perretti: "Symptoms [of alcoholic paranoia] are so classical when you see a case, you spot it . . . . Q . . . Is the symptom of it false accusations of infidelity? A Oh, yes. The true alcoholic paranoid has these ideas of infidelity and they are elaborated upon. They extend in various directions and take on various forms. New delusions and become expanded. [I]t is very classical. You get some deterioration with it. There is deterioration with alcoholic paranoia. This figures in their memory. This is noticeable when they are sober. When sober, the sober alcoholic paranoid expresses these ideas of infidelity when sober, and you notice these . . . false accusations. Unfounded accusations . . . ."

or not on July 26th, 1966, the defendant did, prior to killing Barbara DeJaeger and Arlo Ellingson, actually carefully weigh the course of his action and choose to kill these people after considering the reasons for and against it? A. Yes, particularly the wife. Of course remembering there is another person killed, the man. Q. What is that opinion? A. That he was able to consider his actions. . . . Q. Did [defendant] actually weigh and consider the reasons for and against taking the life of Barbara DeJaeger, and after considering these reasons, going ahead and kill her? A. Yes.''

After pointing out that a person's tolerance of alcohol differs widely with the individual, both doctors stressed that its only effect in this case had been to release defendant's inhibitions to permit him to do an act which he had already at least tentatively planned to carry out. Dr. Perretti said: ''[H]e was mentally clear and not psychotic at the time of the offense. Irrespective of all the drinking he had indulged in, he still was able to know what was going on, and able at the time of the examination to recite to me what had happened, and he gave me this in details.''

■ On the basis of the testimony of these psychiatrists alone, the trial judge had substantial evidence sufficient to justify a finding of first degree murder of Barbara committed by defendant. Both doctors were competent psychiatrists, expressing competent opinions based upon all of the evidence. This evidence showed that defendant at the time of the killings was neither (1) mentally ill, nor (2) intoxicated to the point of incapacity. He was capable of and did have a specific intent to kill Barbara with a premeditation which was both mature and meaningful, together with a specific intent to kill Ellingson with malice aforethought. (There is no serious contention that, as regards the latter victim, the killing was not at least second degree murder—if defendant had the mental capacity to kill anyone.)

■ An unpsychotic defendant capable of sound, meaningful and mature premeditation may not, without criminal accountability, wilfully drink alcoholic beverages for the purpose of screwing up courage sufficient to commit the predetermined act—at least he cannot do so when the consumption of liquor does not render him unconscious but on the contrary leaves him with a clear remembrance of every detail of the killing. To argue the contrary is to argue that not only murder but every other specific intent crime may be committed with impunity under *any* stage of intoxication deliberately and

voluntarily induced. Nor is emotional immaturity the equivalent of immaturity of judgment. We do not construe *People* v. *Goedecke, supra,* 65 Cal.2d at page 857, as intending so to hold. Our surmise is that a very large proportion of the adult population of the world suffers emotional immaturity in some respects, in some degree; and that practically all who commit murder and other serious crimes of violence would have to be classified as persons who, even though they be unpsychotic, are nevertheless emotionally unstable in a very marked degree. The judgments that they make when they decide to kill or assault or rape are not necessarily committed with a lack of realization of the gravity of their offense. ■■■ Defendant here was unquestionably immature emotionally and to a marked degree. The facts of this case, however, are such that the trial judge reasonably held that defendant killed, possessing and exercising a maturity of judgment and realization of the gravity of his acts negating an application of the doctrine of diminished capacity. We so hold.

It is submitted by the defense that the record shows the judge accepted the testimony of Dr. Thompson. He did not do so. But, as an analysis of Dr. Thompson's testimony will demonstrate, his opinion, paradoxically, while contrary to that of the other psychiatrists, is not completely in conflict. Dr. Thompson had also given defendant a clinical psychiatric examination. He had, in addition, given various tests. These tests, however, he declared, although helpful, were not necessary to his diagnosis. That diagnosis had been based upon the history given by defendant. Defendant had not given Dr. Thompson the same history he had given the prosecution's psychiatrists. It was identical in many respects but he had told the doctor, referring to his groundless accusations of Barbara's infidelity, *"While sober,* he sometimes would make these accusations."* (Italics ours.) And contrary to the complete, exact and detailed account he had given Doctors Rood and Perretti of the events of, and preceding, the killing, defendant had told Dr. Thompson, "he remembers taking the shotgun and he thinks he took it to try to scare her *but he doesn't remember clearly what happened."* (Italics ours.) The doctor had gotten the impression "that Mr. Juarez was suffering from what we call an alcoholic *memory blackout. . . .* I get only the impression what he thought at the time of the crime and *he can't tell us clearly the next morning or subsequent days what he was doing at the time."* (Italics ours.) Whereas he had told the other doctors that he had premeditated killing

Barbara when he was at his home, and had gone to the Anderson home fortified by drinking and carrying a loaded shotgun with an intent to carry out his plan, he had told Dr. Thompson that he had only intended to scare Barbara, but when he had "discovered Barbara together with the other man and yet another man and the lady with whom she was staying, and surprised at seeing this crowd of people there he was almost like an actor on stage in the sense he had to carry through once he was there." Dr. Thompson, as the other doctors had done, stated that "accusations of infidelity and the pattern of jealousy are symptoms which are characteristic of a condition known as paranoia." Unlike the other doctors, he did not add that these infidelity-suspicion symptoms would be carried over into periods of sobriety if the patient was indeed an alcoholic paranoid.

Contrary to defendant's statement to the other doctors that he realized Barbara had been faithful and that when sober he realized she had been faithful, Dr. Thompson stated, "we do know he did suspect . . . [Barbara] of living with another man." This we do *not* know. It is squarely contrary to defendant's statement to Doctors Rood and Perretti.

To summarize: Both the prosecution's psychiatrists and the defense's psychiatrist based their opinions upon what defendant had told them. The history given by defendant to the People's experts coincided with reality. The story told by defendant to Dr. Thompson, as related by the latter, did not. The trial judge, therefore, reasonably may have assumed that Dr. Thompson's diagnosis was only inaccurate because defendant had not related a truthful story and the doctor had accepted falsity as truth. By the same reasoning, we must hold, and do hold, that the judge reasonably accepted the opinions of the state's experts based upon a truthful history given by defendant to them.

Defense counsel is inaccurate in stating that the trial court "relied on the testimony of Doctor Captane Thompson." It did not do so. The judge in his oral statement preceding judgment stated that "the cross examination testimony of the psychiatrist Captane Thompson . . . almost without deviation, went down the line of all the elements necessary for first degree murder." That is a far cry from an acceptance of Dr. Thompson's opinion. We can find no place in the record where the judge indicates an acceptance of that.

The argument that the judgment must be reversed because if defendant was guilty of the first degree murder of

Barbara, he must also have been guilty of first degree murder of Ellingson may be answered summarily. Motivation and intent in the two crimes were distinct. Defendant killed Barbara suffering a lover's rage because she had jilted him. He killed Ellingson not because of any belief that Ellingson (any more than the witness Johnston) had taken his place as Barbara's lover. He killed Ellingson only because he had gotten in defendant's way before (seemingly) defendant had completed his job of murdering Barbara. It is unnecessary to consider whether a judgment of first degree murder could legally have been justified for the killing of Ellingson. There was substantial evidence of a wilful killing with malice aforethought.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 28, 1968.