William A. A. TAHL, Petitioner,

v.

Joseph O'CONNOR, Sheriff of San Diego County, Respondent.

Civ. No. 70–234.

United States District Court,
S. D. California.

Nov. 23, 1971.

Charles M. Sevilla, William A. Brockett, John J. Cleary, of Federal Defenders of San Diego, Inc., San Diego, Cal., for petitioner.

Evelle J. Younger, Atty. Gen., by Jay D. Coulter, Deputy Atty. Gen., San Diego, Cal., for respondent.

## MEMORANDUM OF DECISION

TURRENTINE, District Judge.

On February 24, 1966, petitioner, William A. A. Tahl, was sentenced to death by the Superior Court of California, in and for the County of San Diego, subsequent to his pleas of guilty to two counts of murder in the first degree, one count of attempted armed robbery, one count of rape, and one count of grand theft auto. Pursuant to 28 U.S.C. § 2254, petitioner now seeks to overturn his conviction on the following basis:

(1) The standards for the acceptance of a guilty plea as enunciated in the case of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), were not satisfied;

(2) The guilty pleas were not voluntarily and intelligently entered due to:

(a) Inadequate and misleading examination by the trial court as to the meaning and consequence of his pleas;

(b) The disabling effects of petitioner's ingestion of six one-quarter grain tablets of phenobarbital;

(3) The incompetence of counsel rendered the guilty pleas involuntary and generally reduced the entire trial to a sham or farce;

(4) The prosecutor failed to disclose to the defense evidence favorable to the defendant, in direct contravention of the mandate in the case of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963).

After thoroughly reviewing the pleadings, the points and authorities submitted by the parties, the evidence adduced at the evidentiary hearing which was held on September 16 and 17, 1971, and October 14, 1971, as well as the argu-

ments of counsel, this court determines that the Petition of Writ of Habeas Corpus should be denied for the reasons set forth hereinafter. This memorandum of decision embodies the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## I. APPLICABILITY OF THE DOCTRINE ENUNCIATED IN THE CASE OF BOYKIN v. ALABAMA, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed. 2d 274 (1969).

With respect to the first contention, this court is of the opinion the doctrine of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), is inapplicable because of its wholly prospective nature. United States ex rel. Sanders v. Maroney, 438 F.2d 1185 (3rd Cir. 1971); Benn v. Eyman, 436 F.2d 1074 (9th Cir. 1971); Jones v. Fitzharris, 435 F.2d 553 (9th Cir. 1971); Simmons v. Craven, 435 F.2d 554 (9th Cir. 1971); Smith v. Cox, 435 F.2d 453 (4th Cir. 1970); United States ex rel. Baity v. Maroney, 435 F.2d 1254 (3rd Cir. 1970); United States ex rel. Rogers v. Adams, 435 F.2d 1372 (2nd Cir. 1970); United States ex rel. Sadler v. Commonwealth of Pennsylvania, 434 F. 2d 997 (3rd Cir. 1970); Meller v. State of Missouri, 431 F.2d 120 (8th Cir. 1970); Lawrence v. Russell, 430 F.2d 718 (6th Cir. 1970); Perry v. Crouse, 429 F.2d 1083 (10th Cir. 1970); United States ex rel. Grays v. Rundle, 428 F.2d 1401 (3rd Cir. 1970); Moss v. Craven, 427 F.2d 139 (9th Cir. 1970); Miller v. Cupp, 427 F.2d 710 (9th Cir. 1970); Del Piano v. United States, 427 F.2d 1156 (3rd Cir. 1970); United States ex rel. Fear v. Commonwealth of Pennsylvania, 423 F.2d 55 (3rd Cir. 1970); United States ex rel. Hughes v. Rundle, 419 F.2d 116 (3rd Cir. 1969).

## II. VOLUNTARINESS OF THE GUILTY PLEAS.

(1) *Petitioner's contention that the examination by the trial court as to the* *meaning and the consequences of the pleas was inadequate and misleading.*

This court notes that petitioner previously has raised this point before the Supreme Court of California in an original proceeding in habeas corpus. In re Tahl, 1 Cal.3d 122, 81 Cal.Rptr. 577, 460 P.2d 449 (1969). In an able and exhaustive opinion, that court gave careful consideration to this contention and ruled adversely to the petitioner. After a review of that decision and after hearing testimony on this issue, this court concurs with the finding of the Supreme Court of California for the reasons set forth in its decision, that "the trial court here adequately examined petitioner prior to accepting his plea of guilty." In re Tahl, *supra* at 1 Cal.3d 122, 129, 81 Cal. Rptr. 577, 582, 460 P.2d 449, 454.

(2) *Petitioner's contention that the disabling effects of his ingestion of six one-quarter grain tablets of phenobarbital rendered him incapable of voluntarily and intelligently entering a plea of guilty.*

Petitioner contends that on the day which his guilty pleas were entered he had ingested six one-quarter grain tablets of phenobarbital which had the effect of rendering him incapable of understanding the meaning of his pleas. In support of this contention, petitioner testified that the pills were provided him by a cellmate, Edward Graham, who had "palmed" them over a period of time. Evidence was introduced to establish that Edward Graham had received four phenobarbital tablets daily for a period of four months, commencing October 8, 1965 and ending January 23, 1966, while he was incarcerated in the San Diego County Jail. Psychiatric testimony was then presented to establish that there is a cross-sensitivity between alcohol and phenobarbital so that individuals who are highly sensitive to alcohol, such as the petitioner is alleged to be, are likely to be sensitive to phenobarbital.

This contention must fail for several reasons. First, the only evidence which the petitioner has introduced in direct

support of this contention is his own testimony, and the court is well aware that where a witness has a strong personal interest in the result of the suit, the temptation is strong to color, pervert or withhold the facts. Reagan v. United States, 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709 (1895). That some perversion of the facts did occur is evident from certain portions of petitioner's testimony, with respect to this and another matter, which can best be described as outright prevarications. In an apparent zeal to bolster his own position, petitioner testified that Edward Graham had supplied him with the phenobarbital pills during the week of the trial and subsequent thereto (RT. 157). However, evidence presented by the respondent, State of California, clearly indicates that Mr. Graham had been transferred from the San Diego County Jail ten days prior to the entry of petitioner's pleas. Also, in a matter collateral to the instant question, petitioner testified that the victim of the rape, Mrs. Diana Dawson, had visited him several times while he was in jail awaiting trial. During these visitations, according to Tahl, she repudiated her statement to the authorities concerning the alleged rape. This "backtracking" allegedly was made explicit in a letter which Mrs. Dawson mailed to Tahl before the penalty phase of the trial (RT. 119, 120). The letter, as well as the substance of Mrs. Dawson's conversations with petitioner, purportedly, were revealed to petitioner's counsel, who is now faulted for failing to use this information to petitioner's advantage. However, not only did petitioner's former attorney steadfastly deny that such information was communicated to him (RT. 212), but also when Mrs. Dawson was called to testify she unequivocally stated that she had never indicated to anyone that the charge of rape was untrue (RT. 262). The court, therefore, is, constrained to view the testimony of petitioner in a most cautious manner.

Further repudiation of petitioner's contention is found in the fact that each of the two psychiatrists who were called to testify in petitioner's behalf indicated that six tablets of phenobarbital was not a large dosage and would have little effect on the average person. While the argument might be made that petitioner is not an average man in this respect, this court is ultimately persuaded by the fact that no fewer than six witnesses testified that they had an opportunity to closely observe petitioner's demeanor at the time the pleas were entered and detected nothing which would indicate to them that petitioner was under the influence of drugs. These witnesses consisted of the presiding judge, the prosecutor, petitioner's own counsel, the court reporter and two deputies from the San Diego County Sheriff's Office. The court can, therefore, only conclude that, in the words of Albert Camus, "In prison, dreams have no limits and reality is no curb."

## III. INCOMPETENCE OF COUNSEL.

The Sixth Amendment of the Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees to every defendant in a criminal trial, the effective assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Petitioner seeks redress on the basis that the counsel appointed to represent him in the trial was so incompetent as to afford him virtually no representation at all, thereby reducing the trial to a complete farce or sham. While this issue has never been presented to the courts of the State of California and, therefore, is not properly before this court,[1] this court, in the interest of justice, will take cognizance of the question of counsel's competency. Gingrich v. Oberhauser, 305 F.Supp. 738 (1969).

In support of this allegation, petitioner focuses mainly upon five aspects

---

1. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1962) and Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963).

of counsel's representation: failure of counsel to raise the issue of petitioner's diminished capacity; failure of counsel to raise the issue of petitioner's sanity; failure of counsel to introduce in evidence a letter from the rape victim which is purported to have contained information which would have rendered her subject to impeachment; failure of counsel to make an opening statement; and failure of counsel to introduce evidence at the penalty phase other than the testimony of one psychiatrist when additional evidence was available.

To place these contentions in the proper perspective, it is necessary to recapitulate, in some detail, the evidence which was confronting petitioner's former counsel when the critical decisions of trial strategy were being made. However, the court initially notes that this is not a case of an unfortunate defendant being swiftly delivered into the hands of the executioner by an inexperienced attorney who found himself overwhelmed by a superior adversary. Indeed, at the time of petitioner's trial, his appointed counsel had been engaged in the practice of law for eight years, of which three and one half years were spent as a deputy district attorney in San Bernardino County, California, during which time he prosecuted mainly felonies, including two homicides. Subsequent to his experience as a prosecutor, counsel engaged in the private practice of law, devoting twenty-five percent of his time to the representation of defendants in criminal proceedings.

On March 31, 1965, at 4:30 A.M., a San Diego police officer received a radio call to proceed to the Mission Bay Yacht Club to investigate a possible gunshot incident. Upon arriving at the scene, the officer found Victor Bowen and his wife, Vernice Bowen, lying severely wounded in their caretaker's cottage. Both had been shot in the lower abdomen with a .410 shotgun, which was later found on the premises. Their condition was extremely critical, so much so that the attending physicians were amazed that they did not succumb during surgery but rather lingered for several days. Nonetheless, the victims were conscious and able to respond to questions by the officer and his colleagues concerning the identity of their assailant. Each stated that he was an Eskimo by the name of Art Tahl who was employed at the Mission Bay Yacht Club as a handyman, a position he had held for several months previous to this incident. The victims stated that they had been confronted by Tahl brandishing a weapon and demanding the keys to the office safe. Mr. Bowen had refused, whereupon a brief scuffle ensued, ending tragically with petitioner shooting the Bowens from close range.

Petitioner then fled the Yacht Club in a 1953 Ford pickup truck, one of the three motor vehicles which petitioner had stolen on the eve of the shootings. He proceeded to the home of Diana Dawson, where he threatened to kill her child with the knife he was carrying unless she submitted to an act of sexual intercourse with him. Suffice it to say that the evidence overwhelmingly establishes that this act was engaged in without the consent of Mrs. Dawson.

The prosecution also had at its disposal evidence that this was not the first time that the crime of rape had been perpetrated by petitioner. Indeed, in 1959, a rather bizarre incident took place in a sparsely populated area in the northern regions of the City of San Diego. There, petitioner stopped the stolen car in which he was transporting his eighteen year old female passenger, whom he had met only that evening, to her home. He demanded that she partake in an act of sexual intercourse with him, but she refused. The woman fled the automobile and secreted herself in the underbrush, trying to avoid detection until such time as she could escape. But Tahl carefully searched the area, threatening to kill the woman unless she disclosed her whereabouts. After several anxious minutes, she decided to leave her hiding place and began to make her way down the road. However, petitioner caught her and forced her to submit to

an act of sexual intercourse. After completion of the act, petitioner and his victim returned to the automobile at which time he stated that he was taking her to another state. She protested but to no avail. As the car proceeded along the highway the woman opened the door and stuck her legs out in a desperate attempt to attract the attention of a passing motorist. A police patrol car was parked by the side of the road, with its driver a curious spectator to this unusual event. Immediately the officer began to pursue the vehicle at speeds ranging up to 80 miles per hour. As the officer drew his patrol car alongside the fleeing vehicle, petitioner swerved his automobile into the officer's forcing it onto the center island. After petitioner had rammed the patrol car three times, the officer drew his revolver and began firing. One of the bullets hit the left front tire, ending the chase. Petitioner was then taken into custody, but for reasons unknown to this court, these acts were never the basis of any criminal prosecution.

After raping Diana Dawson, petitioner then fled to Dallas, Texas, where he procured employment in a labor pool, using the alias "Arthur Spencer." On April 26, 1965, petitioner arrived late for work, asking if his paycheck was ready. When the operator of the labor pool inquired why he had not shown up for work that morning, petitioner stated that "he and Ward got hold of some bad whiskey" and that Ward was home in bed. "Ward" was William Eugene Ward whose lifeless, battered body was discovered that same day on the floor of the small apartment he and Tahl had been sharing. The evidence established that petitioner had severely beaten and stabbed Ward, and then, in what only can be described as a vicious act of sadism, petitioner took a broken leg of a wooden stool, lubricated it with hair dressing, and inserted it in the victim's rectum.

Tahl then left Dallas and traveled to St. Louis, Missouri, where he brutally beat yet another individual, Marvin

Thomas, his hapless roommate of approximately six months. On the night of November 4, 1965, petitioner attacked Marvin Thomas with a shot-filled blackjack and slashed him across the stomach with a hunting knife. Petitioner then tied the unconscious victim to the bed and commenced to suffocate him, but, in a rare moment of compassion, he changed his mind and satisfied himself by merely robbing Thomas of an undetermined amount of money. After leaving the scene of this crime, petitioner returned fifteen minutes later only to find that police officers had been summoned and already were in the apartment. When one of the officers attempted to question Tahl, he pulled two pistols from his own person and pointed them at the officer. A ninety minute unilateral conversation then ensued, with the petitioner not only making an unsolicited confession of the California and Texas murders but also voicing his intentions to travel to Cleveland, Ohio, where he planned to murder yet another man.

Finally, in what must have been viewed as prosecutorial overkill by the defense, there were three prior convictions for auto theft which the prosecution had at its disposal and which ultimately were introduced at the penalty phase of the trial.

The test by which this court is to judge the competency of petitioner's counsel is clearly established. Petitioner must prevail if he can establish that "the trial was a farce, or a mockery of justice, or was shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference or preparation." Williams v. Beto, 354 F.2d 698, 704 (5th Cir. 1965); Bouchard v. United States, 344 F.2d 872 (9th Cir. 1965); United States ex rel. Cooper v. Reincke, 333 F.2d 608 (2nd Cir. 1964). The test remains the same in capital and noncapital cases alike.

■ Addressing the issue of incompetency of counsel, this court finds that, as to the fifth item of counsel's alleged incompetency, namely, his failure to introduce evidence at the penalty phase other than the testimony of one psychiatrist, there is no merit in petitioner's contention. Aside from the question of Tahl's sobriety and sanity on the morning of the California murders, factors which are discussed below, there has been no showing that additional relevant and persuasive evidence of an extenuating or mitigating nature was available. Petitioner now makes reference to "his background and personal history (e. g., prior history of violence in other children of the family), and the absence of any prior convictions of assaultive crimes." (Petitioner's Proposed Findings of Fact and Conclusions of Law, p. 4). While there has been no indication that counsel had ever been apprised of the family's background, even if the court were to find that counsel knew of these details but elected to keep them from the jury, this court still would not be persuaded that counsel was derelict in this respect. Indeed, evidence of the Tahl family's proclivity for violence and aberrant acts, short of a basis for a defense of insanity or diminished capacity, could have succeeded only in advancing the case of the prosecution; and, as subsequently shown in this opinion, neither of these defenses appeared to be viable.

This court is somewhat amazed by the assertion of petitioner that counsel was negligent in failing to introduce evidence of the "absence of any prior convictions of assaultive crimes," in light of the fact that the prosecution submitted evidence of three savage murders, three aggravated assaults, and two rapes. Suffice it to say that this court fails to understand how evidence that petitioner had never before been *convicted* of similar acts would persuade even the most naive of jurors.

With respect to the fourth item of evidence of counsel's alleged incompetence, failure to make an opening statement, the court points out that opening statements are commonly waived by trial attorneys, especially when counsel has only a weak case to present. In the words of the Fifth Circuit, "It could well be considered that this was no time for defense counsel, at the very outset, in an opening statement to reveal the weak hand he had to play." Williams v. Beto, 354 F.2d 698, 703 (5th Cir. 1965). This was a matter of professional judgment for which this court cannot fault counsel.

Mention has already been made with respect to petitioner's third claim of counsel's incompetency, regarding the failure of counsel to introduce into evidence a letter from the rape victim which is purported to have contained information which would have rendered her subject to impeachment. In support of this contention, petitioner testified that while he was incarcerated in the San Diego County Jail, Diana Dawson, the rape victim, sent him a letter wherein she indicated that she was sorry that she filed the rape charges and the reason for so doing was because of her mistaken belief that she was pregnant by Tahl, the implication obviously being that intercourse was consensual. Petitioner then stated that he personally delivered this letter to his former attorney who failed to use it to his, petitioner's, advantage (RT. 119, 120). However, Mrs. Dawson's version of any letter-writing is in direct contravention of petitioner's assertions, as indicated by the following colloquy:

COUNSEL FOR RESPONDENT: Mrs. Dawson, have you ever, since making these charges, told anybody that they were not true?

MRS. DAWSON: No, sir.

COUNSEL FOR RESPONDENT: Have you ever written a letter, or made a written statement to anybody to the effect that the charges that Mr. Tahl raped you weren't true?

MRS. DAWSON: No, sir. (RT. 262.)

Accordingly, the court finds that there was, in fact, no letter from Diana Daw-

son which would have rendered her subject to impeachment.

Of greater concern to the court is the failure of counsel to raise the question of petitioner's sanity and the issue of diminished responsibility, especially in view of the fact that two psychiatrists were called to testify at this hearing and each was of the opinion that petitioner was not aware of the nature of his acts in shooting Mr. and Mrs. Bowen on March 31, 1965. Indeed, Dr. Phillip Solomon unequivocally stated at the hearing that, in his opinion, petitioner was insane at the time of the shootings (RT. 75); whereas, Dr. Ira N. Frank opined that petitioner was suffering from an alcoholic blackout at the time of the shootings, which rendered him unable to control his actions. (RT. 91.)

Taken out of context, such an "oversight" on the part of any defense counsel would have to be considered of great significance in assessing the competency of the representation provided a defendant accused of homicide in the first degree. However, this court is charged with the responsibility of judging the actions or inactions, of counsel in their proper perspective, namely, at the time preceding and during the trial of petitioner.

It is not as if counsel for petitioner completely overlooked the defense of insanity; indeed, the evidence before this court indicates that petitioner's counsel diligently attempted to procure the services of no fewer than seven psychiatrists, each of whom declined to render assistance because of the amount of time such assistance would entail. Finally, he was successful in persuading Dr. Brent C. Campbell a neurologist and board cer-

tified psychiatrist[2] to consult with the petitioner. Based upon a psychiatric interview, a Minnesota Multiphasic Personality Inventory and an electroencephalogram, Dr. Campbell concluded that petitioner was not insane at the time of the commission of the acts for which he was tried.

It is not for this court now to decide which of the three psychiatrists, Dr. Solomon, Dr. Frank, or Dr. Campbell, is the most learned or most qualified; it is not for this court to now say which of the various approaches used by each psychiatrist was the more proper or more professional one. The role of this court is to scrutinize the actions, or inactions, of *counsel* relative to the question of petitioner's sanity, and thereby determine his competency. Unless it can be said that Dr. Campbell's examination of petitioner was cursory or non-existent or that Dr. Campbell was in some way unqualified to act in the capacity of an expert witness, and petitioner's counsel knew or should have known of these shortcomings, then this court cannot fault petitioner's counsel for relying on the opinion of Dr. Campbell that Tahl was sane at the time of the commission of the offense and structuring the case for the defense accordingly.

The record before this court is devoid of any evidence which would lead this court to conclude that Dr. Campbell's opinion was ill-founded and that petitioner's counsel knew, or should have known, of this fact. On the contrary, the evidence reflects that Dr. Campbell adequately performed his examination by personally interviewing the petitioner and administering him a series of tests. The fact that petitioner is now able to

2. Dr. Campbell's qualifications are as follows: He graduated from the University of Kansas Medical School in 1944, interning at San Diego County Hospital. From 1946 to 1949 he studied diseases of the nervous system at the Rees-Stealy Clinic under the guidance of Dr. F. G. Lindemulder. Dr. Campbell then studied neurology and psychiatry for two years at the University of California Hospital, in San Francisco. From 1951 to the date of the penalty trial, Dr. Campbell practiced as a neurosurgeon and psychiatrist in San Diego. He is an associate member of the American Allergy Association, the American Academy of Neurology, the Southern California Psychiatric Association, the Western Society of Electroencephalographers, the American Medical Association and the California Medical Association. He is qualified for both the Boards of Neurology and Psychiatry.

produce other psychiatrists who take exception to the opinion of Dr. Campbell is not persuasive in resolving the question of counsel's competency. After scrutinizing the psychiatric report submitted by Dr. Campbell and his testimony, as given at the penalty phase of this case, the report of Dr. Melvin G. Goldzband concurring with Dr. Campbell's diagnosis (Exhibit A) and the testimony of Drs. Solomon and Frank, this court can only conclude that this is an instance of well-qualified experts disagreeing as to the conclusion to be drawn from a given set of facts. Each opinion is separately defensible and separately supportable by carefully gathered psychological data concerning petitioner. None can be said to be so unworthy of merit that reliance upon the opinion by an accused's counsel per se, reduces the trial to a sham, farce, or mockery.

Implicit in the argument of petitioner is the contention that counsel was derelict in relying only upon the opinion of Dr. Campbell. While petitioner's present counsel disclaims any suggestion that his predecessor should have engaged in the oft-practiced art of doctor-shopping, the point is made that more than one psychiatrist should have been consulted. As previously indicated, petitioner's former counsel contacted no fewer than seven psychiatrists, each of whom declined to examine petitioner, before he was able to procure the services of Dr. Campbell. This well-qualified neurosurgeon and board certified psychiatrist was unable to provide defense counsel with even a scintilla of hope that the defense of insanity was a viable issue. On the contrary, in his opinion, petitioner suffered only from a sociopathic personality, a defect which falls short of qualifying as a basis for defense of insanity. McMullen v. Superior Court, 6 Cal.App.3d 224, 85 Cal.Rptr. 729 (1970).

■ In the last analysis, the test must necessarily be that of the reasonably competent defense attorney. With this standard in mind, the court cannot say, as a matter of law, that it was incumbent upon petitioner's counsel to consult with other psychiatrists, especially in light of the qualifications of Dr. Campbell and his considered opinion that the defense of insanity was not medically supportable.

Turning next to the question of diminished capacity, petitioner's present counsel makes an able argument in support of his contention that the failure of petitioner's former counsel to raise this issue was evidence of his incompetency. However, after listening to the explanation of petitioner's former counsel, which was rendered at the evidentiary hearing in this case, this court finds that his decision not to place this issue before the jury is entirely defensible.

■ There can be no doubt that counsel was very much aware that voluntary intoxication, though not a complete excuse of homicide, may be the basis of diminished capacity as a defense to murder. People v. Juarez, 258 Cal.App.2d 349, 65 Cal.Rptr. 630 (1968). This awareness is reflected both in the notes which counsel prepared prior to trial (Exhibit 3) and from his testimony at the evidentiary hearing:

Q. What defense strategies did you consider on the issue of guilt or innocence at the trial phase?

A. If we were to put on a defense, the only possibility I saw was the possibility of using the diminished capacity. Frankly, there was little you could go to as far as defense. There was not a question, apparently, no raising of a question of the acts not having been committed, which certainly limited what you can raise in the juror's mind. The rest of the question was mainly of mental capacity.

Q. Did you consider the factor of drunkenness on the evening of the shootings?

A. Yes, and felt that if I had any possibility of working with it, I had to have medical support. Without the medical support, I felt it would harm Mr. Tahl rather than help him, if he attempted to go himself with this testi-

mony and had an almost directly contradictory evaluation from Dr. Campbell.

Q. When you indicated you needed medical testimony, are you referring to the issue of drunkenness?

A. No, not on the issue of drunkenness; but I had to consider that again, the fact we had almost, as I recall, about six hours of constant activity involving movements of three or four, I think three vehicles, actions covering travel across and about the city. I felt that trying to support that without a psychiatrist's opinion was more harm than it was good.

Q. Did you have a psychiatrist's opinion on the issue of drunkenness that evening?

A. Only that part of the report that indicated that the doctor did not seem to find a mental state that would indicate a great deal of drunkenness on this evening. His opinion seemed to be contraindicated. (RT. 40).

Q. Referring your attention to the last paragraph where Dr. Campbell is discussing the issue of alcoholism, would you read that into the record please?

A. "Although I personally think that alcoholism is a defense in certain instances. I do not believe that this man has the disease of alcoholism as such. His manner of presentation, the psychiatric interview, as well as . . the other tests would certainly indicate a primary sociopathic personality with the usual behavior resulting from that." (RT. 42).

Q. If I understand your testimony, your attempt—you attempted to find witnesses who could testify that Mr. Tahl had been drinking, or was under the influence of alcohol, and you were successful?

A. No, I found witnesses who would say he had been drinking, but I could not find—could not get witnesses that would go on the idea that he absolutely did not know what he was doing, and I could not get a tie in with some medical testimony that would present, in my mind, at least, a good diminished capacity defense. Yes, you could have put on Mr. Tahl, you could have put on these other people. It was highly questionable as to how successful the defense would be. (RT. 66, 67).

*    *    *    *    *    *

Q. Let me go over one point again. The reason you did not call any witnesses that would have testified that Mr. Tahl had been drinking in the—regarding the diminished capacity defense is simply you did not feel they would be credible to the jury, is that correct?

A. That's correct; and I also felt that even if believed at that point, they were going to hurt us bad. At this point the question was of life or death. To my way of thinking, if the jury got the idea it was a drunken spree, it was the best thing to send him to the gas chamber. (RT. 212, 213).

Q. If you had testimony available as to Mr. Tahl's consuming a great deal of liquor, and his appearing intoxicated, why is it that you decided to forego that defense?

A. For this reason, and I think I reiterated it before. I had testimony available that he had been drinking a great deal. I had Wilma Tahl's testimony. I had his own, and whoever else was residing in the house. As I recall, that was in the police reports. These people would testify he had been drinking, and drinking a great deal, according to the information I had; but I had this problem. There is an indication of lack of recollection. I have no doctor who is going to support me on the point of diminished capacity. The witnesses I talked to, and in my estimation, would not have really established this defense in the minds

of the jury; and I have, again, the idea that there is no recollection. I have a complete statement taken in St. Louis, and as far as I could tell, it would have gotten by the Miranda defense, because all indications are the officers there didn't know about these matters in San Diego. So, you don't have an accusatory statement as to this crime where the—where you could use the Miranda defense. To my understanding and belief at that time, that evidence was going to come in, and I'm up against this problem. I have all the movement. I have Diana Dawson who would talk about the rape charge, indicating not a particular amount of drinking. To me the focal point was whether I could back it up with medical testimony, and I had no good medical testimony. (RT. 223, 224.)

The defense of diminished capacity was one which counsel adequately explored, but one for which he could find no persuasive evidence to place before the jury in support thereof. At the evidentiary hearing in this matter, petitioner's present counsel adduced testimony from witnesses who ostensibly were in a position to testify in Tahl's behalf at the trial but were not called. Petitioner, himself, also testified regarding his level of intoxication and his inability to recall the events which transpired. However, after having had the opportunity to personally observe the demeanor of these witnesses and review the substance of their testimony, along with other evidence relevant to this issue, this court is of the considered opinion that the decision on the part of counsel not to put this testimony before the jury was the result of careful calculation as to the adverse effect such testimony might have on the jury. This court finds that, to a great extent, the testimony of these witnesses as to the degree of petitioner's intoxication is rebutted by other evidence which was available at the time of trial and which was subsequently brought to the court's attention at the evidentiary hearing.

Those factors which stood to undermine any defense of diminished capacity are as follows: Tahl now claims that he was so intoxicated at the time of the commission of the capital offense that he was unable to formulate the requisite specific intent, yet there is evidence of constant activity on Tahl's part for a six hour period of time immediately before and after the shooting of Mr. and Mrs. Bowen. This activity consisted of not only the theft of three different automobiles and a substantial amount of driving across one of California's largest urban areas, but also involved an accomplished act of sexual intercourse. In direct contravention of petitioner's contention of an "alcoholic blackout" is the testimony of Diana Dawson wherein she stated that Tahl gained entrance to her home by means of a ruse, telling her that her mother was so seriously ill that she was being taken to a hospital. Once within her home, Tahl admitted he had lied, saying he was playing an "April Fool's" joke. After consummating the rape, petitioner requested a cup of coffee. While Mrs. Dawson was preparing the coffee she turned on the radio and heard that two people were shot at the Mission Bay Yacht Club, the suspect being William Tahl. When Mrs. Dawson did not hear the names of the victims mentioned in the broadcast, she rhetorically asked "Oh, I wonder who that was." Petitioner immediately replied "That was Vic and his wife." (RT. Penalty Phase, 396, 397).[3] Later testimony indicated that the news broadcast did not identify the victims; the only logical inference, in view of the other evidence submitted, was that the petitioner was the conscious perpetrator of these acts, and that he was not intoxicated at the time of this encounter with Diana Dawson, which took place no more than ninety minutes after the shootings.

Additionally, the prosecution had the benefit of Tahl's detailed St. Louis con-

3. Reference to "RT, Penalty Phase" means petitioner's Exhibit 5, which consists of four volumes.

fession, wherein he stated that he "killed two people in San Diego, California, on April Fool's Day of this year (1965) with a shotgun." (RT., Penalty Phase, 483, 484). He then went on to state that his victims were an elderly man and woman who had been his former employers at a yacht club in the San Diego area, and that after the shooting he had taken an unknown amount of money from the man. (RT. Penalty Phase, 484.) These acts are hardly representative of a man who was too intoxicated to form a requisite specific intent to support a conviction of first degree murder under California Penal Code, §§ 20, 187 and 189.

Petitioner emphasizes the fact that Dr. Ira Frank is now of the opinion that petitioner was operating in an "alcoholic blackout" at the time of the shootings. (RT. 93). However, Dr. Frank admitted that he had not been apprised of the fact that Tahl's St. Louis confession which certainly establishes an awareness by petitioner of the nature of his acts in San Diego. While Dr. Frank stated that such information would not substantially vary his opinion, he stated he would certainly have less confidence in the opinion. This court shares Dr. Frank's failing confidence in such an opinion.

Essentially, this issue devolves into one similar to the question of petitioner's sanity, and must be resolved in a like manner. Petitioner has produced a psychiatrist who now concludes that petitioner was suffering from an "alcoholic blackout" at the time of the shootings, but Dr. Campbell explored this question of intoxication and concluded that the defense was not a medically supportable one:

> In view of the sociopathic scale and the story which this man told, I do not fully believe any of the details concerning his treatment at the county jail, the story that he was completely blacked out during this episode when the offense occurred, as well as many of the other details of his former life. (Exhibit 4, p. 2.)

Again we are confronted with the dilemma of choosing between the differing opinions of two well qualified psychiatrists. Again we reiterate, that it is not the role of the court, in the resolution of this issue, to make such an election. This court is reviewing only the representation accorded by petitioner's counsel and finds that he was completely justified in relying upon the opinion of Dr. Campbell that a defense of diminished capacity by virtue of voluntary intoxication was not medically supportable.

Faced with petitioner's repeated desire to plead to the offense, (RT. 133, 134), the lack of medical testimony regarding this "defense," the fact of constant activity on the night of the shootings, Tahl's St. Louis confession and the testimony of Diana Dawson who had previously stated to petitioner's counsel that there was no indication that Tahl was intoxicated (RT. 209, 210), and after hearing the witnesses who were available to testify in support of this defense, this court does not find that his decision to forego the interposition of the defense of diminished capacity reduced the trial to a farce or a sham.

## IV. NONDISCLOSURE BY PROSECUTOR OF EVIDENCE FAVORABLE TO THE DEFENDANT.

The gravamen of this assertion of error is that the prosecutor failed to disclose to the defense the information which he is alleged to have received from Diana Dawson to the effect that the act of sexual intercourse with Tahl was consensual. The prosecutor is then supposed to have threatened to prosecute Mrs. Dawson for perjury should she vary her testimony from that given to the grand jury. Were such allegations within the realm of reality, this court would have no choice but to order the issuance of the writ. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, such is not the case.

In support of this contention, petitioner called the prosecutor, who is now a

judge of the Municipal Court of the San Diego Judicial District, and who emphatically denied such allegations. Diana Dawson was then called, and she also indicated that no such information had been communicated to anyone. Accordingly, this court finds no misconduct on the part of the prosecutor and no basis for petitioner's final contention.

## V. CONCLUSION

For the aforementioned reasons, this court finds each of petitioner's contentions of error to be without merit. Petitioner has failed to establish that any of his safeguarded constitutional rights were violated in the initial trial of the case. This court finds that petitioner was adequately represented by competent counsel at those proceedings and that he knowingly and intelligently entered a voluntary plea of guilty to the offenses for which he had been indicted. Further, there has been no showing that the prosecutor in any way abused his office and prejudiced petitioner by failing to disclose evidence favorable to the accused. Lastly, as previously stated, the doctrine enunciated in Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), is not to be applied retroactively.

The court is well aware of petitioner's plight and the strong temptation to beleaguer the federal courts with numerous petitions under 28 U.S.C. § 2254 in an attempt to stay indefinitely the execution of his sentence. Accordingly, the court specifically notes that petitioner was accorded ample opportunity to submit each and every allegation of error which might constitute grounds for the issuance of said writ. Additionally, petitioner was accorded full opportunity to raise all issues of fact and conclusions of law in support of his allegations of error.

This court also specifically finds that petitioner was ably represented by competent counsel from the office of Federal Defenders of San Diego, Inc., whose manner of preparation and presentation is beyond criticism.